In the Matter of CONTINENTAL VEND-
ING MACHINE CORP. and Continen-
tal Apco, Inc., Debtors.

JAMES TALCOTT, INC., Appellant,

v.

Irving L. WHARTON, Trustee,
Appellee.

No. 115, Docket 73–1296.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1973.

Decided Jan. 22, 1974.

J. Jacob Hahn, New York City (Julius J. Abeson, Hahn, Hessen, Margolis & Ryan, New York City, of counsel), for appellant.

Morton J. Schlossberg, New York City (Joseph J. Marcheso, New York City, of counsel), for appellee.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal arises from a refusal by the trustee in bankruptcy of Continental Vending Machine Corp. ("Continental") to make payment on several certificates issued by him and by his fiduciary predecessor, a court appointed conservator for Continental, in connection with three loans by James Talcott, Inc. ("Talcott"), a New York corporation, to Continental and its wholly owned subsidiary, Continental Apco, Inc. ("Apco"). Talcott applied for a court order directing payment on the certificates on September 25, 1972. The trustee maintained, and the district court found, that payment should be denied on the ground that Talcott had disregarded its obligation under an agreement entered into by it on August 14, 1964, which was construed by the court to require it, before it could look to the trustee for payment, first to use certain funds realized from the sale of certain of Continental's vending routes to satisfy the certificates. The district court also ordered Talcott to account for all moneys received from or on account of Continental or Apco and to apply them according to its agreement as construed by the court. Because we do not accept the view that the agreement was unambiguous we remand for more detailed findings and conclusions as to the circumstances surrounding the agreement and the intent of the parties in entering it.

Continental and its subsidiary Apco are in the vending machine business, with Continental operating several "routes" of vending machines and Apco manufacturing such machines. Continental's agreement with Talcott, dated

August 14, 1963, the terms of which are at issue here, was entered by the parties in the course of a long series of financial arrangements involving Apco as well as Continental and beginning, for our purposes, in 1960. Any attempt to understand the obligations of the parties requires a review of their rather complex and convoluted prior dealings with each other.

The background begins on May 11, 1960, when Talcott, a New York corporation engaged principally in the business of lending money, agreed to advance to Continental up to 75% of the net amount of Continental's accounts receivable in exchange for an assignment to Talcott of these accounts plus the right to hold "all property of [Continental] at any time to its [Continental's] credit or in [Talcott's] possession or upon or in which [Talcott] may have a lien or security interest, as security for any and all obligations of [Continental] at any time owing to [Talcott]. . . ." On April 1, 1961, Talcott entered a similar financing agreement with Apco and received an assignment of Apco's accounts receivable.

■ Early in 1963 a deteriorating financial situation at Continental led to the court's appointment, upon application of the Securities and Exchange Commission to the Southern District of New York, of a conservator, John P. Campbell. Apco was not a party to the conservatorship proceedings and continued to operate as a going concern outside the conservatorship. On May 29, 1963, Campbell, acting with authorization from Judge Bonsal of the Southern District, borrowed $175,000 from Talcott for Continental and gave a conservator's certificate [1] guaranteeing repayment of this loan.

On June 24, 1963, Apco borrowed $200,000 from Talcott to keep its operations continuing. In connection with this loan Apco delivered to Talcott notes promising repayment, which stated that the notes were issued pursuant to the April 1, 1961, financing agreement between Apco and Talcott and that they were entitled "to all the benefits of any security provided therein." Six months later, after Continental had gone into reorganization pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., its trustees in bankruptcy were authorized to issue certificates guaranteeing repayment of Talcott's earlier $200,000 loan to Apco.

Thus, at all times relevant to this appeal, Talcott's May 29, 1963, loan of $175,000 to Continental was evidenced by conservator's certificates and Talcott's June 24, 1963, loan of $200,000 to Apco was not only evidenced by Apco's promissory notes and secured by the assignment of receivables pursuant to the April 1961 financing agreement but also guaranteed by certificates issued by trustees for Continental. In addition Talcott, as the financier of many of Continental's "routes," held (1) mortgages and conditional sales agreements on the vending machines located on these routes, (2) assignments of route location contracts, and (3) provisions for cross-collateral in route financing agreements, similar to the provisions that were part of the 1960, 1961 and 1963 financing agreements already described.

The involuntary petition for the reorganization of Continental under Chapter X of the Bankruptcy Act was filed in the United States District Court for the Eastern District of New York on July 10, 1963, and approved by Judge Mishler of that court on July 12, 1963, with Campbell and Irving I. Wharton being appointed as trustees. When Apco, still neither in conservatorship nor in reorganization, needed more money to stay

1. The parties do not dispute that this certificate, like the trustees' certificates subsequently issued, see *infra*, was, to the extent it remained unsatisfied, entitled to priority over all other claims secured or unsecured, as a cost or expense of administration within the meaning of 11 U.S.C. § 104(a)(1). Cf. 6 W. Collier, Bankruptcy ¶ 6.40 (rev. ed. 1972).

in business and to exhibit a new machine to the industry, it sought a further loan from Talcott which agreed, subject to approval by the Eastern District of New York, to lend it an additional $650,000 pursuant to the terms of existing financing agreements (i. e., the April 1, 1961, and June 24, 1963, agreements between the parties), to be evidenced by promissory notes, provided the loan would be additionally secured by certificates issued by Continental's trustees guaranteeing repayment of the loan and, subject to certain conditions, by part of the proceeds expected to be realized from Continental's sale of certain of its vending routes. An agreement purporting to incorporate the terms of the loan was drafted. Since this appeal arises out of a dispute as to the meaning of certain provisions of that agreement, it is the key document for present purposes.

On August 14, 1973, an application was made by Continental's trustees and by Apco for authorization to enter into the agreement with Talcott for the $650,000 loan. The application stated that the debt service on the routes to be sold exceeded the cash flow (profit before debt service) by some $500,000 per year and that because of "the enormous amount of debt claimed by (creditors with loans secured by the routes) there appears to be no equity in the routes." However, the application went on to state that the debtor owned the inventory in these routes, estimated as worth $450,000, free and clear of any liens, that sale of the routes would enable the debtor to realize on the inventory, and that the $650,000 loan from Talcott would provide working capital that would enable manufacture of machines to be undertaken.

The agreement itself, also dated August 14, 1963, stated in pertinent part:

"[T]he Trustees of Continental will bring on for sale . . . the so-called Santa Ana, San Francisco and Buffalo cigarette and music routes.

. . . The total funds received from the sale of the three routes above-mentioned, exclusive of the amounts attributable to inventory value, shall be paid to you [Talcott] on closing of the sale, and you hereby agree to credit Continental in reduction of its debts, obligations and liabilities to you the total amount of the funds received by you from such sale less all payments [necessary to satisfy vendor's or lendor's liens or encumbrances] . . . . You further agree that after you have given such credit . . . the surplus, if any, then remaining in your hands shall be turned over to the Trustees.

"We also represent that the said Trustees will bring on for sale . . . the so-called Detroit route . . . the so-called Hammond, Indiana route and the so-called St. Louis, Missouri route. . . .

"We also represent that the Trustees will use the funds received by them from the sale of the three above-mentioned routes (not including the funds received from the sale of inventory of said routes) first to pay off any and all liens on any specific property sold. . . .

"The balance of such funds plus any other funds to which the Trustees may become entitled by virtue of the sale of the above-mentioned six routes shall be used as follows: First to retire any Conservator's Certificates presently remaining unpaid together with interest thereon; second to pay to us sufficient funds to enable us to pay off the total indebtedness of $650,000 created herein; third to pay to us sufficient funds to enable us to pay any unpaid balance of your prior advance to us of $200,000; and fourth the Trustees shall hold any balance of the funds received from the above-mentioned sales in a separate account subject to the determination of the rights of any persons who may have claims thereon."

In an order dated August 16, 1963,[2] Judge Mishler granted "in all respects" the trustees' motion for an order authorizing them to enter into the August 14, 1963, agreement. The order recited in a prefatory paragraph that the money received for the routes was to be used

> "to liquidate existing secured indebtedness on the said routes and the balance of said proceeds to be used to liquidate certain administration expenses now existing on behalf of the debtor and any residue to be used by the debtor for such purpose as it may see fit. . . ."

The Santa Ana, San Francisco and Buffalo cigarette and music routes were, on September 9, 1963, sold for $2,850,000. Since the purchase price was advanced by Silco Automatic Vending Co. the parties have referred to the funds received and held by Talcott from the sale of these three routes as the "Silco reserve."

On October 4, 1963, a petition was filed in the Eastern District of New York for the reorganization of Apco under Chapter X of the Bankruptcy Act and this petition was approved by an order dated October 10, 1963. Later it became clear that Continental's trustees would need even more money to save the business of the two companies and so still another loan—this time for $750,000—was sought and obtained in November 1963 from Talcott. The November loan agreement provided for, and there was attached to it, various statements, all as of October 31, 1963, showing, among other things, (1) the total liability of Continental and Apco to Talcott and its subsidiaries, (2) the actual and provisional balances held by James Talcott, Inc. to the credit of Continental, and, finally (3) Talcott's overall collateral position. Both the credit balance and the collateral position statements referred to the Silco reserve.

The former referred to the reserve as a credit held by Talcott "against the obligations owing to it by Continental" and the latter included the reserve as collateral for the "payment or retirement of the obligations, whether direct or as guarantor, of the Conservator and/or the Trustees with respect to certificates or borrowings."

Under the November loan agreement, Continental was also required to deliver a general release to Talcott, which Continental did on January 24, 1964. The release discharged Talcott from any claim which Continental might have on account of "any transactions, acts or omissions on the part of (Talcott)," but specifically excepted from the release "[a]ny obligation on the part of Talcott under the Order of (the) Court approving the sale of the California and Buffalo routes to satisfy and discharge prior liens on any of the equipment included in the sale of the said routes."

Campbell resigned as a trustee for Continental on September 14, 1964. On June 23, 1969, Wharton, continuing as Continental's sole trustee, filed a reorganization plan proposing, among other things, that all claims, except secured claims,[3] against Continental and Apco be treated on a consolidated basis so that claims against one could be satisfied out of assets of the other. An amended version of the plan was approved by Judge Mishler, pursuant to 11 U.S.C. § 574 on May 20, 1971, on the grounds that the managements of the two companies were virtually identical and not independent, that dealings between the two companies served Continental's needs alone and that Apco had no separate economic existence from Continental and constituted a mere instrumentality of Continental. After approval by Judge Mishler Talcott, pursuant to 11 U.S.C. § 579, objected to its ultimate confirmation on the grounds that by virtue of the clause ex-

---

2. This order was resettled on September 3, 1963, for reasons not relevant here.

3. In its objection to confirmation of the reorganization plan Talcott alleged that on

"information and belief" it alone held secured claims against Continental or Apco.

cepting secured claims from the effect of the consolidation, the plan improperly deprived Talcott of its right, in view of the virtual identity of the two debtors, to use collateral pledged by Apco against debts of Continental.

In its petition in the district court, dated September 25, 1972, Talcott alleged that it was still owed, as of December 31, 1971, $101,861.91 (principal plus interest) on its May 29, 1963, loan to Continental, $139,819.46 (principal plus interest) on its June 24, 1963, loan to Apco, and $633,805.85 (principal plus interest) on its August 14, 1963, loan to Apco.[4] Since these loans had been approved by court order and represented expenses of administration evidenced by trustees' or conservator's certificates, Talcott asked for an order directing payment out of the assets held by Continental's trustee. Judge Mishler, however, found that the August 14, 1963, loan and route sale agreement, when "viewed in the light of the history and purpose of the agreement and further amplified by the court in its order of August 14 (sic) 1963," was "unambiguous" and that it required Talcott to use the Silco reserve to be applied toward payment of outstanding conservator or trustees' certificates rather than toward payment of any other debts of Continental to it. Since Talcott apparently had not done this, but instead had used the reserve to pay off other debts of Continental—including charges for legal and miscellaneous expenses—Judge Mishler denied Talcott's petition for payment of the certificates and ordered it to make a "detailed accounting of all moneys received from or on account of the debtors (Continental and Apco) and apply the moneys to the credit of the debtors in accordance with" the court's decision.

On this appeal by Talcott from the district court's decision both parties, in advancing their multiple claims and contentions, have gone far beyond both the four corners of the August 14, 1963, agreement and the other narrow issues considered by the district court. Talcott insists that the agreement permitted it to use the Silco reserve to pay off any debt of Continental to it, not just the conservator and trustees' certificates. It relies not only on the language of the agreement—specifically the first part broadly authorizing it to use the funds "to credit Continental in reduction of its debts, obligations and liabilities to you [Talcott]"—but also on the statement of actual and provisional credit balances as of October 31, 1963, which included the Silco reserve as a credit against the obligations of Continental without making any specific reference to conservator or trustee certificates, and also the January 24, 1964, release, which, in excepting Talcott's obligations under the August 14 route sale agreement, made no reference to any obligation to pay off conservator or trustee certificates. In reply, the trustee offers as additional support for its own and the lower court's interpretation of the agreement the collateral position statement attached to the November 1963 loan agreement which, at Schedule F, says that the Silco reserve is collateral for the payment of the certificate obligations. Furthermore the trustee insists that acceptance of Talcott's interpretation of the agreement and a grant to Talcott of permission to use the Silco reserve to pay off Continental's debts to it other than those incurred by Continental's conservator and trustee would result in an impermissible preference with respect to those other debts.

Both parties dispute here, although the district court made no express holding on the matter, a separate issue, i. e., whether Talcott was obligated not only to use the Silco reserve to pay off the conservator's and trustees' certificates but also to use the funds collected on Apco's accounts receivable to pay off *Apco's* June and August borrowings, which underlay the trustees' certificates, as distinguished from borrowings by *Continental.* The trustee, arguing that

---

4. Apparently the November 1963 loan to Apco has been completely repaid.

the funds collected on Apco's receivables must be applied to Apco's borrowings, relied on the promissory notes issued by Apco in connection with the June and August borrowings wherein Apco pledged its accounts receivable as security for these new borrowings. Echoing its objection to confirmation of the reorganization plan, Talcott says it had every right to apply money collected on behalf of Apco to any debts of Continental since the two entities were found by Judge Mishler, in connection with his order of May 20, 1971, approving the reorganization plan, not to be independent. Thus, Talcott continues, a detailed accounting showing that it credits certain receipts to one debtor (Apco) rather than to the other (Continental) is unnecessary. The trustee does not respond directly to this oblique attack on the district court's accounting order, but asserts that the accounting issue is moot since Talcott has filed all accountings required by a schedule fixed by the district court.

Finally, both parties dispute the propriety of Talcott's charges for alleged legal, auditing and collection expenses in connection with liquidation of its security. Talcott says that these charges were fully authorized by its financing agreements with Continental and Apco [5] and were specifically approved when the statement of the total liability of Continental and Apco and its subsidiaries as of October 31, 1963 (attached to the November 1963 loan agreement) was agreed to by Continental's trustees.

## DISCUSSION

Normally we would refer to the district court's interpretation of an agreement authorized and approved by it. In this instance, however, the record indicates that the district court may not have considered all of the facts relevant to the provisions of the agreement required to be construed. Furthermore,

whether or not the facts related to us by the parties are considered, we cannot agree with the district court's characterization of the August 14, 1963, agreement as "unambiguous" in light of its history and purpose and as "amplified" by the court order approving it. We are particularly troubled by the failure of the first portion of the agreement (third paragraph), which deals with Talcott's obligations arising out of the payment to it of the proceeds from the sale of the Santa Ana, San Francisco, and Buffalo routes (the Silco reserve), to make any specific reference to the conservator's or trustees' certificates of the debts which they guaranteed. These are referred to, but only later on in the agreement in that portion (sixth paragraph) dealing with the trustees' obligation after Talcott had received the proceeds from the sale of the other three routes (Detroit, Hammond and St. Louis) plus whatever was left, if anything, *after* Talcott had used the proceeds from the sale of the first three routes "to credit Continental in reduction of its debts, obligations, and liabilities."

Under the trustee's interpretation of the agreement, concurred in by the district court, we cannot see how the "debts, obligations, and liabilities" portion of the agreement can be explained. If, by referring to Continental's "debts, obligations and liabilities" in this portion of the agreement, the parties intended to restrict Talcott to payment first of the outstanding trustees' or conservator's certificates (or the debts they represented or guaranteed) it seems likely they would have said so, particularly in view of their later explicit language (sixth paragraph) setting forth the trustees' obligations with respect to the funds they received from the route sale.

The district court apparently reasoned that Talcott's interpretation of the agreement was impossible since the

5. Under these agreements Continental and Apco agreed to repay Talcott for "all costs and expenses incurred, including a reasonable allowance for attorneys' fees, to obtain or enforce payment of any receivables assigned" or of any obligations of Continental or Apco to Talcott.

"purpose of the sale was to make available some cash to Continental in the hope that the manufacturing operation would continue," and that this purpose could hardly be accomplished if the agreement gave Talcott the right to use most of the proceeds from the sale to pay off *any* pre-existing debt of Continental's. But the record makes clear that except for the proceeds realized from the sale of the unencumbered inventory, Continental's trustees had no hope of raising money from the sale itself; rather the money to continue Apco's manufacturing operations was to come principally from the loan induced by the sale. Thus in their application for court approval of the August 14, 1963, agreement the trustees stated that "[b]ecause of the enormous amount of debt claimed by . . . secured creditors (i. e., Talcott), there appears to be no equity in these routes for the debtor." Clearly this statement suggests an awareness on the part of Continental's trustees of Talcott's general lien on these routes and an expectation that Talcott would receive the sale proceeds in reduction of any or all of Continental's "debts, obligations, and liabilities" to it.

■■■ The district court also relied on its previous order approving the agreement which recited that the proceeds of the route sales were to "be used to liquidate existing secured indebtedness on the said routes and the balance of said proceeds to be used to liquidate certain administration expenses." The trustee points out that, since the order was settled on notice to Talcott, the latter's failure to object to the court's recital evidences its concurrence in the recitation as the proper construction of the agreement. We disagree. Talcott is not in any sense bound by the court's recital. There is no dispute that "recitals as to things proper to be shown in the record on which a judgment rests may be overborne by reference to that record." Bass v. Hoagland, 172 F.2d 205, 208 (5th Cir. 1949), cert. denied, 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1950). In deciding whether to autho-

rize the trustees to enter the agreement the district court had no power to rewrite the agreement. Cf. Houston Oilers, Inc. v. Neely, 361 F.2d 36 (10th Cir. 1966), cert. denied, 385 U.S. 840, 87 S. Ct. 92, 17 L.Ed.2d 74 (1967); Jaeger v. Canadian Bank of Commerce (Cal.), 327 F.2d 743 (9th Cir. 1964). Indeed, the district court made no attempt to do this. Rather the decretal part of the order simply granted the trustees' motion for an order authorizing them to enter into the August 14, 1963, agreement, "in all respects." Thus in no way did the authorization order relieve the district court of the duty, when a dispute subsequently arose, to look to the agreement rather than to the order's prefatory recital and give effect to every part of the agreement if reasonably practicable. See National Equipment Rental, Limited v. Reagin, 338 F.2d 759 (2d Cir. 1964); Kelso v. Kelso, 225 F.2d 918 (10th Cir. 1955); Dolch v. Garrard Publishing Co., 289 F.Supp. 687 (S.D.N.Y.1968).

Continental's trustee asserts that "[p]erhaps the most telling argument" against Talcott's position is that it would result in a preference to Talcott over Continental's other creditors. Essentially, the trustee is saying that prior to the August 14, 1963, agreement the Santa Ana, San Francisco and Buffalo routes were the property of the trustees and Talcott had no greater claim to the proceeds of their sale, beyond the extent of its vendor's or purchase money lendor's liens, than any of Continental's other creditors, except as to the conservator's or trustees' certificates. This argument ignores the pre-1963 financing agreements which gave Talcott a right to hold "all property" of Continental in which Talcott might have or obtain a security interest, as security "for any and all obligations of [Continental] at any time owing to [Talcott]." The trustee does not assert that these agreements were invalid under New York law or improperly filed or that Talcott had a security interest in the three routes which had attached within four months before the filing of the involuntary reorganiza-

tion petition. See 11 U.S.C. § 96. The trustee merely insists that, while Talcott's debt "was secured . . . to the extent that it held valid liens against specific property of the debtors," the Silco reserve "was nothing more than funds held by Talcott as disbursing agent for the trustees."

■■ The trustee seems to be saying that Talcott's general lien against the routes could not continue in the cash proceeds of their sale, even if the general lien was initially valid and perfected. We disagree. Nothing in the Bankruptcy Act forbids a secured creditor of an insolvent debtor from receiving the cash proceeds from the sale of his collateral provided he can trace them. Cf. Uniform Commercial Code § 9–306(4). Absent any showing or finding by the district court that Talcott had not perfected a general lien on the San Francisco, Santa Ana, and Buffalo routes, we cannot see how Talcott's interpretation of the August 14, 1963, agreement would be impermissible under the Bankruptcy Act.

■ In light of the fact that the parties are now advancing upon us several contentions not addressed to or by the district court, involving factual details which do not appear in the record, we are constrained to remand the case to the district court for a closer examination of the agreement as a whole—particularly the "debts, obligations, and liabilities" language—and the circumstances surrounding the agreement. A remand will give the district court a new opportunity to consider the several documents and matters outside of the agreement to which the parties are now referring us, including the statements and release accompanying the subsequent loan in November 1963, and the trustees' argument that Talcott's interpretation would constitute a preference. In the absence of more detailed findings of fact and conclusions of law by the district court with regard to these documents and contentions, we cannot render a final decision on the issues which they raise.

■ We also consider it both unnecessary and unwise to rule now on the issue of whether Talcott was required to limit application of the moneys it collected on Apco's accounts receivable to Apco's debts to it, since the district court has not yet ruled on this issue and Talcott appears to be raising the issue only in an effort to avoid an accounting which it has already given. Talcott insists that a ruling from us is necessary because it has only accounted for the period after October 31, 1963 (the date of the statements of liability, credit balance and collateral which were attached to the November 1963 loan agreement) and it wants to be sure it will not be ordered to account for earlier periods. In the absence of any indication that the district court is presently dissatisfied with the accountings already rendered and in view of the fact that the district court is presently considering exactly the same contention—that Talcott is entitled to treat the debts of Continental as the debts of Apco—in connection with Talcott's objection to confirmation of the trustees' reorganization plan, a decision by us on this matter would be premature. Talcott will have every opportunity to appeal on this issue if on remand the district court reverses its prior construction of the August 14, 1963, agreement but continues to refuse an order directing payment on the certificates on the ground that the underlying indebtedness should have been reduced from the funds collected by Talcott on Apco's accounts receivable.

■ We do not read Judge Mishler's decision as a final determination that Talcott's charges for legal, auditing and collection expenses in connection with the liquidation of its security are rejected. Judge Mishler has only sought to prevent Talcott from circumventing the proof of claim procedure, see 11 U.S.C. § 596, by making payments to itself for these charges, even though the charges had never been allowed by the reorganization court, out of the moneys received from or on behalf of Continental and Apco. Once again, in view of the

present state of the record, and the limited findings of fact by the district court, we are in no position to pass on the propriety of these charges. We agree with Judge Mishler, however, that Talcott will not be entitled to payment of these charges without first submitting a proof of claim and gaining court approval pursuant to 11 U.S.C. § 596. In the absence of a proof of claim and court approval, Judge Mishler was therefore correct in disallowing the charges.

For the reasons stated we remand to the district court for further proceedings.