In re CONTINENTAL VENDING MA-
CHINE CORP. and Continental
Apco, Inc., Debtors.

JAMES TALCOTT, INC., Appellant,

v.

Irving L. WHARTON, Trustee, Appellee.

Nos. 1015, 1419, Dockets 75–5025, 75–5026.

United States Court of Appeals,
Second Circuit.

Argued May 10, 1976.

Decided Sept. 22, 1976.

---

J. Jacob Hahn, New York City (Hahn, Hessen, Margolis & Ryan, Julius J. Abeson, New York City, of counsel), for appellant.

Joseph J. Marcheso, New York City (Morton J. Schlossberg, New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and MANSFIELD and SMITH, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal raises more issues in the seemingly interminable Chapter X bankruptcy reorganization of Continental Vending Machine Co. (Continental) and its subsidiary Continental Apco, Inc. (Apco) (herein collectively referred to as "debtors"), which has spawned a series of controversies between the reorganization trustee and James Talcott, Inc. (Talcott), a secured creditor, resulting in several earlier decisions here and in the Eastern District of New York.[1] The present controversy arises

1. 517 F.2d 997 (2d Cir. 1975); 491 F.2d 813 (2d Cir. 1974); 318 F.Supp. 421 (E.D.N.Y.1970).

out of Talcott's filing of a proof of claim in the bankruptcy proceedings for reimbursement of legal and accounting fees pursuant to security agreements entered into between Talcott and the debtors prior to bankruptcy. After referring the issue to Magistrate Vincent A. Catoggio as a special master and receiving his report, Chief Judge Jacob Mishler entered an order substantially reducing the fees that had been approved by the master.

Talcott here appeals that order, claiming that the standards to determine the compensability of legal services and other expenses incurred by Talcott were erroneous, that the district court committed reversible error in disregarding factual findings of the special master, and that because Judge Mishler had served as witness in another phase of the bankruptcy proceeding he should have disqualified himself under 28 U.S.C. § 455. We agree that erroneous standards were applied and accordingly reverse and remand for a recomputation of allowable attorneys' fees. We reject Talcott's other contentions except to suggest that, while § 455 does not mandate Judge Mishler's disqualification, he might nevertheless consider whether the appearance of justice would not be better served if another judge were to undertake the recomputation.

Since much of the background of the controversy is detailed in our earlier decisions (see 491 F.2d 813, 814–18; 517 F.2d 997) we here limit ourselves to a brief summary. Until institution of the current Chapter X bankruptcy proceedings in 1963 Continental and its subsidiary Apco were in the business of manufacturing and operating vending machines. Financing for their operations was provided principally by Talcott under loan agreements of the "dragnet" type commonly used by factors, which specified that all sums which were or might become owing under the agreements would be secured by liens on assets of the respective debtors and that in the event of default Talcott would be entitled to collect, in addition to principal and interest owing, all costs and expenses, including reasonable attorneys' fees, incurred to enforce payment of the obligations or in the prosecution or defense of any litigation growing out of the agreements or obligations. Upon the present appeal Talcott relies upon these agreements as the basis for its claim for reimbursement for legal services and other expenses incurred in proceedings related to the ensuing bankruptcy, which we briefly summarize.

In 1963 investigations by the Internal Revenue Service and the Securities and Exchange Commission led to appointment of a conservator for Continental. At that point Talcott, which was owed approximately $3.5 million by Continental and $2 million by Apco, began liquidating the security behind its loans to Continental. At the same time it advanced working funds to Continental, secured by conservator's certificates, as a means of enabling the latter to continue in operation as a going concern. Funds secured under the original loan agreements were also advanced to Apco for working capital. An involuntary petition for the reorganization of Continental under Chapter X of the Bankruptcy Act was filed in the United States District Court for the Eastern District of New York on July 10, 1963, and approved by Judge Mishler on July 12, 1963.

Talcott meanwhile obtained an offer from Silco Automatic Vending Company (Silco) for the sale to it of three major vending machine routes owned by Continental, all elements of which were subject to Talcott's lien except for route inventory, which was held free and clear by Continental. At the same time, Continental's trustees requested a further loan from Talcott of $650,000, stating that otherwise they would be forced to shut down operations, which would reduce the value of the routes in which Talcott held security interests. Talcott refused, offering to advance only $100,000, and insisted that the sale of the three routes be brought before the court immediately. There followed on August 14, 1963, a meeting with Judge Mishler, which resulted in an agreement by the parties, approved by the court, to the effect that

the trustees would sell the six routes in which Talcott held security interests and would turn over the resulting funds to Talcott as its disbursing agent towards satisfaction of Continental's obligations to Talcott, in return for which Talcott would advance funds to Apco, secured both by the resulting funds and by certificates to be issued by Continental's trustees. On September 9, 1963, three of the routes were sold to Silco, producing a fund held by Talcott and known as the "Silco reserve."

In October, 1963, a petition for the reorganization of Apco under Chapter X of the Bankruptcy Act was filed in the Eastern District of New York and approved by the court. The history thereafter is one of more loans by Talcott to the two companies in reorganization, secured by both the Silco reserve and the trustees' certificates and subject to the condition that the trustees would waive objections to certain of Talcott's liens which the trustees had threatened to raise.

On June 23, 1969, the remaining Continental trustee (one of the two trustees had resigned) filed a reorganization plan proposing in part that all unsecured claims of both Continental and Apco be treated on a consolidated basis so that the assets of each company could be used to satisfy the unsecured claims of the other. Talcott opposed the plan and appealed Judge Mishler's order approving a modified version of it on the ground that it discriminated against secured creditors by not including them in the consolidation. We upheld the plan. 517 F.2d 997 (1975).

We now come to Talcott's claims for reimbursement of legal fees and expenses, which are the subject of this appeal. In all of the above proceedings and in many other minor proceedings and transactions also related to the bankruptcy, Talcott participated and was represented by counsel. Talcott claims that all such attorneys' fees were covered by the terms of the original security agreements providing for reimbursement of enforcement and collection expenses. In a petition filed with the district court on September 25, 1972, Talcott requested repayment of all outstanding trustee's and conservator's certificates out of assets held by Continental's trustee, which would leave the Silco reserve in its possession free to be applied toward payment of Talcott's secured claims and enforcement expenses.

The trustee opposed the motion, claiming that under the August 14, 1963 agreement, the certificates must be satisfied out of the Silco reserve held by Talcott, and countermoved for an order directing Talcott to file an accounting of all of the moneys it had received on its security. In an order dated February 13, 1973, Judge Mishler denied Talcott's petition and granted that of the trustee. Talcott filed an accounting and appealed. We held that the August 14, 1963 agreement was ambiguous as to whether it required that the Silco reserve be used to satisfy Continental's obligations to Talcott (*including reimbursement of legal expenses*), as distinguished from conservator's or trustee's certificates, and that an evidentiary hearing must be held to determine its meaning. Equally important for present purposes, we further held that Talcott would have to obtain the district court's approval for any reimbursement for legal fees. 491 F.2d 813 (1974).

Upon remand, Judge Mishler directed Talcott to file its proof of claim for such reimbursement, which was done. Judge Mishler disqualified himself from presiding over the hearing to determine the meaning of the August 14, 1963 agreement, however, on the ground that he had previously expressed an opinion regarding its proper outcome. He subsequently agreed to testify and did testify on behalf of Continental's trustee in the hearing before the late Judge Orrin G. Judd, who upheld Talcott's position, thus freeing the Silco reserve for application toward payment of Continental's obligations under its earlier security agreements with Talcott, including any obligation to reimburse Talcott for legal fees and expenses incurred by it to enforce payment under those agreements.

With respect to Talcott's claim for attorney's fees and other expenses, to which the

trustee objected, Judge Mishler held that the proof offered was insufficient and by order dated May 22, 1974, referred the matter to Magistrate Vincent A. Catoggio as special master to receive further proof, to "hear and report on the reasonable value of the claim" and to "make findings of fact as to the nature of the services rendered, the time consumed by each item, and the reasonable rate per hour for the particular service performed (taking into account the professional standing of the lawyer, accountant, or other individual performing the services)."

At the hearing before the master, only Talcott offered evidence, including the testimony of Jacob Hahn, Esq., of the firm of Hahn, Hersen, Margolis and Ryan, which had been paid $267,490 by Talcott for services and disbursements, Frederick Ballon, Esq., an attorney specializing in bankruptcy practice, who testified as to the reasonable value of the services rendered by Mr. Hahn's firm, and voluminous exhibits, including records of the various proceedings and of the negotiations relating to Continental in which the Hahn firm had participated over the years back to 1963. As to certain proceedings or matters, the trustee conceded that a certain number of hours of professional time had been spent by Hahn's firm. As to others, the trustee questioned the claimed number of hours but offered no contrary proof. Claims for other services were challenged on the grounds that they were not compensable under the financing agreements or that they involved only benefits to Talcott or could not be supported by any contemporaneous time records.

In his report filed April 28, 1975, the master concluded that the terms of the Continental-Talcott security agreements provided the standard governing the compensability of the legal services and expenses for which reimbursement was claimed by Talcott. Accordingly he held "that attorney's fees are payable only in connection with enforcing payment of a receivable assigned or the debtor's obligation or in connection with a suit by or against Talcott or the debtors concerning any matter growing out of the agreement. Unless the services fall within either of these two categories compensation for them may not be allowed herein." Applying this standard he found that most of the Hahn firm's services were compensable because they were rendered in connection with Talcott's enforcement of Continental's obligations to pay or in litigation related to such enforcement. Specifically, he allowed 3662 of the 4296 hours that Talcott had claimed, applying without objection by Talcott hourly rates lower than those originally claimed by Talcott but used by Judge Mishler to determine attorneys' fees in a related proceeding. To the resulting sum of $127,250 he added a bonus for the results obtained by Talcott's attorneys and for the quality and expertise of their work, pointing out: "That Mr. Hahn's services repeatedly rescued the debtors from total ruination has been demonstrated above. The complexities and intricacies of the questions with which he had to deal are equally apparent. The Silco transaction alone involving a sale for $2,820,000 and complicated corporate and financing arrangements itself alone was a masterful stroke and this and others were of the greatest benefit to the debtors. The sums of money involved were very large." He found the reasonable value of the Talcott's attorneys' compensable service to be $150,000 in all. In addition, the master allowed claims for other expenses to the extent of $95,645.38. In all he found that Talcott was entitled to reimbursement of $248,876.97 for attorneys' fees and disbursements.

Upon Talcott's motion to confirm Magistrate Catoggio's report, which was objected to by the trustee, Judge Mishler, in a decision and order dated November 18, 1975, held that claims for reimbursement for legal services under the terms of the Continental-Talcott security agreement might be allowed only if they met the requirements of § 243 of the Bankruptcy Act, 11 U.S.C. § 643, which provides that a judge may allow reasonable compensation for legal services and disbursements incurred by creditors and stockholders in connection with their submission of, suggestions for, or

objections to, a plan of reorganization or in connection with the administration of an estate, but that the court may consider only services which contribute to the plan or a refusal of confirmation or which are beneficial to the estate.[2]

Judge Mishler summarized his view on the governing principles as follows:

"However, the authority of the district court is not expanded '. . . merely because the contract [between creditor and debtor] calls for a payment of attorney's fees.' *In re Intaco Puerto Rico, Inc.,* 357 F.Supp. 1122, 1125 (D.P.R.1973), or includes broad language which may be construed to authorize such. *In re General Stores Corp.,* 278 F.2d 437 (2d Cir. 1960). Rather, the agreements provide only the basis for awarding counsel fees, costs and expenses under the statute,[5]

"[5] Talcott further analogizes its position in claiming fees to that of the trustee on a deed of trust securing a loan in *Brown v. Security Nat'l Bank,* 200 F.2d 405 (4th Cir. 1952). This analogy is unpersuasive since the language in the clause at issue in *Brown* provided for indemnification by the debtor of all expenses 'including any and all attorney's fees incurred,' 200 F.2d at 406, and since the fees for which the trustee in *Brown* sought an allowance were for services directly related to the collateral covered by the deed of trust. In any case, the better view in that contractually-based attorney's fees '. . . serve [only] as a maximum limit of the reasonable fee which is to be determined by the bankruptcy court.' *In re Intaco Puerto Rico Inc., supra.*"

*Ruskin v. Griffiths,* 269 F.2d 827, 829, 833 (2d Cir. 1959). This writer presided over and is familiar with, the multifarious proceedings since the filing of the involuntary petition against Continental on July 5, 1963, and is aware of those services rendered by Talcott in the proceedings for which reimbursement is claimed. *In re Wingreen Co.,* 452 F.2d 637 (5th Cir.

1971); *Gochenour v. Cleveland Terminals Bldg. Co.,* 142 F.2d 991, 995 (6th Cir.), *cert. denied,* 323 U.S. 767, 65 S.Ct. 120 [89 L.Ed. 614] (1944). Nevertheless, the broad discretion vested in this court to charge attorney's fees to the debtors' estate is circumscribed by § 243 of the Act. *In re Chicago and West Towns Rys.,* 230 F.2d 364, 368 (7th Cir.), *cert. denied [Edward v. Friedman,]* 351 U.S. 943, 76 S.Ct. 837 [100 L.Ed. 1469] (1956); *Delafield, Marsh & Hope v. Silbiger,* 228 F.2d 838, 841 (2d Cir. 1956). . . . The proof adduced by the claimant must be two-fold: it must establish the number of hours spent in performing legal services, and it must support the claimant's contention that the legal work is compensable under § 243."

Applying this two-fold standard (the terms of the security agreements *and* of § 243), Judge Mishler then reviewed the items of Talcott's claim and drastically reduced it, eliminating or cutting most of the services on one or more of the following grounds: (1) they "were not in any way part of any plan or reorganization under Chapter X or of the administration of the debtor's estate"; (2) although they benefited the estate, the debtor was already represented in the particular matter or proceeding by competent counsel; (3) they were rendered to Talcott or for its benefit rather than to the debtor; (4) they did not protect or preserve the debtor's assets; (5) "The financing and factoring agreements cannot be construed to permit fees that would be improper under § 243 of the Act"; (6) the Hahn firm partners duplicated each other's work; (7) the number of hours was exaggerated; (8) "The trustee was adequately represented in the negotiations and sale, both in legal and non-legal services"; (9) it was not shown that the particular "services were rendered

**2.** "The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred by creditors and stockholders, and the attorneys for any of them, in connection with the submission by them of suggestions for a plan or of proposals in the form of plans, or in connection with objections by them to the confirmation of a plan, or in connection with the

administration of the estate. In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, and to the proper costs and expenses incidental thereto."

11 U.S.C. § 643.

to enforce collection of Continental's obligations or for the protection of the estate"; (10) "fees incurred in opposing a plan of reorganization are not compensable under § 243 unless the opposition is successful." Although the trustee had conceded that some of the services claimed by Talcott were compensable, the court nevertheless *sua sponte* disallowed such claims or substantially reduced them. Judge Mishler also disallowed the bonus of approximately $22,750 allowed by Magistrate Catoggio. The modifications resulted in an allowance of $28,735 for legal services and $90,373.84 for other expenses.

Upon motions for rehearing Continental requested further examination of certain allowed disbursements, and Talcott argued that Judge Mishler should have disqualified himself under 28 U.S.C. § 455 because he had testified against Talcott in the hearing before Judge Judd. By order dated December 15, 1975, Judge Mishler disallowed $5,341.01 of previously allowed disbursements and denied Talcott's motion for disqualification. Talcott here appeals the orders of November 18, 1975, and December 15, 1975.

## DISCUSSION

### *Compensability of Talcott's Legal and Other Expenses*

■ The first question is whether the district court erred in modifying the special master's report on the ground that, while certain services or disbursements were compensable under the terms of the Continental-Talcott security agreement, they failed to satisfy the requirements of § 243 of the Bankruptcy Act, 11 U.S.C. § 643, which Judge Mishler held to govern Talcott's claim. Talcott argues that its lien for attorneys' fees constituted an ordinary secured claim governed by the terms of the security agreement and that § 243 is therefore inapplicable. We agree.

Prior to the adoption of the Chandler Act, which added § 243 in 1938, attorneys' fees were allowed in corporate bankruptcy proceedings, provided they satisfied the conditions of either of two sections of the Bankruptcy Act. The first was § 77B(c)(9), 48 Stat. 912 (1934) (formerly 11 U.S.C. § 207), which, pursuant to the general principle articulated in § 62, 11 U.S.C. § 102, to the effect that the expenses of administration were to be paid out of the bankrupt's estate, permitted a bankruptcy judge to grant "reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by . . . parties in interest . . . and [their] attorneys. . . ." The second was § 63, 11 U.S.C. § 103, under which attorneys' fees that had become the obligation of the debtor prior to the institution of bankruptcy proceedings could be proved and claimed like any other debt.

The difference between the types of legal services compensable on each of the two grounds was substantial. Thus under § 77B(c)(9) compensation was disallowed if the services did not benefit the estate or were duplicative of services by other attorneys. See, e. g., *In re Paramount Publix Corp.*, 85 F.2d 588 (2d Cir. 1936), *cert. denied*, 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865 (1937). See generally *Developments in the Law—Reorganization Under Section 77B of the Bankruptcy Act*, 49 Harv.L.Rev. 1111, 1199–1204 (1936). By contrast, the validity and construction of a lien for attorneys' fees contained in a chattel mortgage agreement entered into prior to the institution of bankruptcy proceedings were simply questions of state law. *Security Mortgage Co. v. Powers*, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236 (1928); *In re Kashmir Refinishing Co.*, 94 F.2d 652 (2d Cir. 1938); *In re International Raw Materials Corp.*, 22 F.2d 920 (2d Cir. 1927). The difference was clearly stated in *In re American Motor Products Corp.*, 98 F.2d 774, 775 (2d Cir. 1938), where we rejected a trustee's claim that the amount of attorneys' fees payable under a mortgage agreement should be subject to the general discretionary power of the bankruptcy court:

"Much of the appellant's argument for reversal of the order below rests upon the theory that the bankruptcy court has the

power, notwithstanding the agreement of the parties to the mortgage, to fix the fee. However well founded such a position might be if this were a proceeding in the nature of an allowance for an attorney's fee under the provisions of the Bankruptcy Act, it fails to be effective where the real question is only the amount of the lien of a mortgage valid to secure a debt as of the date of bankruptcy. This lien was absolute as of that date and the bankruptcy did not make it invalid. The consideration for it was the loan made and not the services of the attorney. And, of course, the trustee in bankruptcy took the mortgaged property subject to the lien. *Boise v. Talcott*, 2 Cir., 264 F. 61. The appellee here is not seeking to prove any claim in bankruptcy but merely to have the amount of an agreed counsel fee allowed as part of the principal debt covered by a lien on the property sold. The Bankruptcy Act does not stand in the way. *Security Mortgage Co. v. Powers, supra.*"

Section 243 was made part of the Chandler Act primarily because it was felt that judicial decisions under § 77B, disallowing compensation for duplicative services, had resulted in a committee of majority interests dominating the formulation of reorganization plans. Section 243 was therefore "enacted to encourage participation by individuals who might contribute something of value to the plan or to administration of the estate." *In re Porto Rican American Tobacco Co.*, 117 F.2d 599, 601 (2d Cir. 1941). See 6A Collier on Bankruptcy ¶ 13.12, at 976–78 (14th ed. 1972). There is no evidence whatever that Congress, in enacting § 243, intended to restrict the enforceability of obligations undertaken prior to the institution of bankruptcy proceedings, whether for attorneys' services or for any other services or goods.

Nor, indeed, do decisions since 1938 support such a contention. In *In re Essential Industries Corp.*, 150 F.2d 326 (2d Cir. 1945), this court enforced a similar clause for reasonable attorneys' fees according to its terms under New York law and without

reference to § 243. We similarly recognized the independent validity of such a clause in *In re New Haven Clock & Watch Co.*, 253 F.2d 577 (2d Cir. 1958), and in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), although in the latter case it was found that the claimed services fell outside of the terms of the clause. Other courts have also distinguished between compensation awarded under § 243 and compensation granted pursuant to a prior contractual agreement. See, e. g., *In re Ferro Contracting Co.*, 380 F.2d 116 (3d Cir.), *cert. denied, Barbato v. Livingston Nat. Bank*, 389 U.S. 974, 88 S.Ct. 475, 19 L.Ed.2d 466 (1967); *National Acceptance Co. v. Zusmann*, 379 F.2d 351 (5th Cir.), *cert. denied*, 389 U.S. 975, 88 S.Ct. 478, 19 L.Ed.2d 469 (1967); *In re Neil Properties, Inc.*, 360 F.Supp. 914 (S.D.Cal.1966); *In re Schafer's Bakeries*, 155 F.Supp. 902 (E.D. Mich.), *appeal denied for lack of jurisdiction*, 249 F.2d 448 (6th Cir. 1957).

■ The validity and construction of the present clause must therefore be judged according to New York law, not § 243. That clause requires, in the event of default, payment by the debtor of

"all costs and expenses incurred, including a reasonable allowance for attorney's fees, to obtain or enforce payment of any receivable assigned or of any obligations of the undersigned [Continental or Apco] to you [Talcott], or in the prosecution or defense of any action or proceeding either against you [Talcott] or against the undersigned [Continental or Apco] concerning any matter growing out of or connected with this agreement and/or the receivables assigned or any obligations of the undersigned to you."

Although neither party has briefed the issue, we are satisfied that such a provision is valid and enforceable under New York law and so hold. See, e. g., *In re American Motor Products Corp.*, 98 F.2d 774 (2d Cir. 1938); *In re Magnus Harmonica Corp.*, 159 F.Supp. 778 (D.N.J.1958), *aff'd*, 262 F.2d 515 (3d Cir. 1959); *Manufacturers Trust Co. v. Cavell*, 206 Misc. 818, 135 N.Y.S.2d 566 (1954); *In re Mercantile Dye Works*, 177 Misc. 454, 31 N.Y.S.2d 296 (1941); *Commer-*

*cial Investment Trust v. Eskew,* 126 Misc. 114, 212 N.Y.S. 718 (1925).

The scope and construction to be given to the clause raises a somewhat more difficult question, as to which we find no state law guidance, either statutory or decisional. Even when we construe the clause narrowly as marking the outer limits of Talcott's rights to reimbursement, in line with the policies of the Bankruptcy Act as recently enunciated in *In re American Express Warehousing, Ltd.,* 525 F.2d 1012 (2d Cir. 1975); see also *In re Essential Industries Corp.,* 150 F.2d 326, 328 (2d Cir. 1945); *In re Kashmir Refinishing Co.,* 94 F.2d 652, 654 (2d Cir. 1938), we agree with the special master that its terms are nevertheless rather broad. It authorizes Talcott to incur two types of reimbursable legal services and expenses: (1) those furnished or expended in connection with Talcott's obtaining or enforcement of payment of "any obligations" of the debtors to Talcott, and (2) those undertaken in connection with a suit by or against Talcott or the debtors concerning "any matter growing out of or connected with" the agreement.

We interpret the agreement's broad language as permitting Talcott to recover for such services and expenses as were reasonably necessary to enforce the debtor's obligations and to collect the amount remaining due pursuant to those obligations. In applying this standard, a rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses. While the criterion must, of necessity, be a general one, and it leaves much to the discretion of the trial judge, it does provide a workable standard. Under it, for instance, Talcott would be entitled to compensation for such services as were reasonably necessary to obtain the appointment of a receiver for the pledged assets, the filing of proofs of claim in the bank-

ruptcy proceeding, the negotiation and arrangement for the sale and liquidation of the security and the taking of such steps as were essential to preserve Continental as a viable business enterprise so that it could be sold as a going concern. On the other hand, Talcott would not be entitled to reimbursement for services that were unnecessary or unconnected with enforcement or collection of the indebtedness, services that would have been incurred by Talcott regardless of its efforts to obtain payment, or services that had little or no chance of achieving the objective of payment. For instance, where Talcott's interest appears to have been remote and indirect (such as in the preparation of its officers for the taking of their depositions in a suit against Continental's officers charging fraud and dissipation of its assets) the trial judge would be justified in concluding that the services could not be classified as reasonably necessary to enforce and collect the indebtedness to it.

We recognize that to some extent the services rendered to Talcott as a creditor might have duplicated those furnished by other counsel to the trustee in the same matter. However, the fact that the trustee, acting on behalf of the estate, saw fit to provide legal and accounting services in connection with some actions jointly taken by himself and Talcott, did not preclude Talcott from protecting its interest as a secured creditor in obtaining payment, which might differ from that of the estate. However, where the interests of Talcott and the trustee were parallel, the provision of duplicative services by the trustee may be taken into account in appraising the extent and value of the services reasonably necessary to preserve Talcott's interests.

*Revision of the Special Master's Findings*

Talcott's second claim is that the district court erred in disregarding factual findings made by the special master as to the amount and value of particular services rendered.[3] Appellant relies on Rule 53(e)(2)

---

**3.** Talcott does not seriously press its contention that allowances in reorganization proceedings may not properly be referred to a special mas-

ter under Rule 53, F.R.Civ.P. This position is understandable, in view of its failure to object below and our approval of similar references in

of the Federal Rules of Civil Procedure, which provides in relevant part: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

▮ To the extent that the court modified some of the special master's allowances on the ground that Talcott had presented no contemporaneous records or other substantial evidence supporting its claims as to hours spent on legal services, we are governed by the principle that a master's findings are not binding on review unless supported by substantial evidence. *General Plywood Corp. v. Georgia-Pacific Corp.*, 362 F.Supp. 700, 704 (S.D.Ga.1973), *aff'd*, 504 F.2d 515 (5th Cir. 1974); *In re Collins*, 141 F.Supp. 25, 27 (S.D.Cal.1956); see *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Furthermore, the extent to which the hours claimed or actually expended were reasonably necessary and therefore compensable would in any event constitute a mixed question of fact and law, as to which the special master's conclusions are reviewable. *In re Hygrade Envelope Corp.*, 366 F.2d 584, 587–89 (2d Cir. 1966); *Mamiye Bros. v. Barber Steamship Lines, Inc.*, 360 F.2d 774, 776–77 (2d Cir.), *cert. denied*, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). Thus the district court did not err in reviewing those factual findings which appeared to lack substantial evidentiary support and any legal conclusions reached by the special master. However, in any such review the district judge must, of course, be guided by the standards already outlined.

*Disqualification*

▮ Finally, Talcott asserts that Judge Mishler should have disqualified himself under 28 U.S.C. § 455, the applicable version of which[4] provides in relevant part: "Any

justice or judge of the United States shall disqualify himself in any case in which he . . . has been a material witness. . . ." See Act of Dec. 5, 1974, Pub.L. No. 93–513, § 3, 88 Stat. 1609. The purpose of this provision is to prevent a judge from having to pass on the competence and veracity of his own testimony given with respect to a matter presently in controversy before him. The mere fact that he may have testified with respect to some wholly unrelated matter should not disqualify him, see *Winters v. Travia*, 495 F.2d 839, 841 (2d Cir. 1974), since it does not require him to pass upon the credibility of his own testimony and there is no reason to suppose that his decision might be affected by his unrelated testimony. Were the rule otherwise, a judge in an extended and multi-segmented bankruptcy case like this one, who has patiently sat on this case for many years, would be forced, for no sound reason, to disqualify himself as to the entire case, leading to wasteful duplication, delay and expense.

▮ In the present case Chief Judge Mishler's testimony in the proceeding before Judge Judd to resolve the ambiguity in the Continental-Talcott letter agreements of August 14, 1963, did not deal with the nature and extent of the services and expenses incurred by Talcott in its efforts to enforce and collect the indebtedness due it, or the proper compensation of Talcott's attorneys under the security agreements. Section 455 therefore did not require Judge Mishler to disqualify himself.

However, Judge Mishler did testify against Talcott with respect to the proper interpretation of the earlier agreement and Talcott's rights under it. His testimony involved references to the participation by Talcott's counsel in the negotiation of that agreement and the proceeding ended with a

other cases, see *CAB v. Carefree Travel, Inc.*, 513 F.2d 375 (2d Cir. 1975).

4. On December 5, 1974, the statute was amended. The amended version used the words "Matter in controversy" in lieu of the word "case," a change to which the trustee attaches significance. However, the amendatory act

provided that the new version should not apply to the trial of any proceeding commenced prior to December 5, 1974. See Act of Dec. 5, 1974, Pub.L. No. 93–513, § 3, 88 Stat. 1609. Since this proceeding was commenced with reference of the matter to the special master on May 22, 1974, the 1948 version of § 455 applies.

decision by Judge Judd accepting Talcott's contentions. Under the circumstances, although Judge Mishler is not required to disqualify himself, we suggest that he might desire to do so in the interest of maintaining the appearance of observing the highest standards of fairness, for which he has always been respected by bench and bar alike.

The case is remanded to the district court for recomputation in accordance with the foregoing of the amount to be allowed to Talcott for reimbursement of legal fees and expenses.