Ronald BRADLEY et al., Plaintiffs,

v.

William G. MILLIKEN, Governor of the State of Michigan, et al., Defendants.

Civ. No. 35257.

United States District Court,
E. D. Michigan, S. D.

Jan. 21, 1977.

Order Concerning Referred Issue
Feb. 14, 1977.

Memorandum Opinion and Final Order
Concerning Referred Issue
Feb. 28, 1977.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Boston, Mass., for plaintiffs.

George T. Roumell, Jr., Riley & Roumell, Theodore Sachs, Marston, Sachs, O'Connell, Nunn & Fried, Detroit, Mich., George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

Plaintiffs have filed a motion seeking the recusal of the presiding judge in this case. Plaintiffs' motion was filed pursuant to 28 U.S.C. § 455 and the American Bar Association Code of Judicial Conduct, Canons 3A(4) and 3C. Plaintiffs complain that the court engaged in "various *ex parte* discussions, negotiations and other contacts" with various community groups. They contend that these contacts were undertaken in a "manner which deliberately excluded the plaintiffs and their counsel in [sic] the process of shaping the desegregation plan for the Detroit Public Schools." Plaintiffs make two principal assertions: first, that prior to our August 15, 1975 opinion, we met *ex parte* with representatives of the Detroit Board of Education to discuss the opinion which had not been released, and, second, that the court met *secretly* with numerous individu-

als and groups prior to the issuance of our opinion, that these individuals were *secretly* informed of the contents of the court's decision, that their views in support of our opinion were solicited, and that the court continued to meet with various community groups and representatives of the defendant Detroit Board of Education after the filing of our August 15, 1975 opinion. Plaintiffs contend that as a consequence of these actions, the court's "impartiality might reasonably be questioned" within the meaning of 28 U.S.C. § 455(a) and, further, that these actions violate Canon 3A(4).[1]

Plaintiffs' motion, which was not filed until November 23, 1976, is untimely. *United States v. Patrick,* 542 F.2d 381, 390 (7th Cir. 1976); *Thomas v. United States,* 363 F.2d 849 (9th Cir. 1966). Plaintiffs were aware of the court's actions of which they now complain for more than 15 months prior to the filing of this motion. They urged these actions upon the United States Court of Appeals for the Sixth Circuit as grounds for reversal of this court's judgment (see brief for plaintiff-appellant, Dec. 22, 1975 at 5 and n. 6). Plaintiffs do not explain why, if they believed that these actions were grounds for recusal, they did not file the instant motion with this court on the same day as the filing of their brief in the Court of Appeals. This court's jurisdiction, moreover, continued following our August 15, 1975 opinion, and we have resolved numerous issues which have been raised concerning the ongoing desegregation of the Detroit city schools. Plaintiffs

have appeared, without questioning this court's impartiality, on several of these matters. On others, plaintiffs chose voluntarily not to appear.[2] 28 U.S.C. § 455, however, places the duty of disqualification squarely upon the presiding judge. Were plaintiffs' assertions grounds for recusal, we could not sit on this case regardless of any implied waiver or the untimeliness of the motion. *See United States v. Amerine,* 411 F.2d 1130 (6th Cir. 1969).[3]

The gravity of the allegations of plaintiffs' motion further compels us to consider the merits of their claim. The court's jurisdiction in this case is continuing, and will continue so as to enable the court to resolve issues posed by the remand of the United States Court of Appeals for the Sixth Circuit. *Bradley v. Milliken,* 540 F.2d 229 (6th Cir. 1976), *cert. granted,* —— U.S. ——, 97 S.Ct. 380, 50 L.Ed.2d 325 (1976). It is incumbent upon us to reassure all parties involved in this litigation of our continued ability to impartially preside in future proceedings. We are aware that Detroiters have voluntarily complied with our orders and have accepted our efforts to assure Detroit school children a quality, desegregated education. Unlike Louisville and Boston, Detroit has accepted desegregation peacefully. On the day we ordered implementation of the Detroit Plan, we said:

. . . Having assured the Detroit community that the court has weighed the practicalities of the situation fully, we are confident that the plan will re-

---

1. We note that plaintiffs' motion was not accompanied by a supporting brief and, therefore, did not conform with Local Rule IX(j). Nevertheless, we treat the motion as properly filed so that we may reach the merits of plaintiffs' contentions.

2. At the hearing on the defendant Detroit Board's motion for injunctive relief involving the proposed conversion of the Salvation Army's Evangeline Residence for Women into a state correctional facility, plaintiffs apparently authorized representatives of the state defendants to speak on their behalf (Tr., May 21, 1976 at 762–64).

3. Based on the 1948 changes in the statute, the court in *Amerine* concluded that motions filed

pursuant to 28 U.S.C. § 455 should never be treated as waived. The 1948 changes occurred as part of a general revision of Title 28. Since the decision in *Amerine,* the Supreme Court has indicated that the function of the revisers of the Judicial Code in 1948 was generally limited to that of consolidation and codification. Consequently, even where provisions are altered, no change in the law is presumed unless clearly expressed. *Tidewater Oil Co. v. United States,* 409 U.S. 151, 161, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972). In view of *Tidewater,* one might question the continued validity of *Amerine.* Because we choose to reach the merits of plaintiffs' motion, we need not resolve this issue.

ceive the cooperation and support of the entire community. When cooperation and support are granted freely, the plan will succeed. The support of the community will afford the Detroit school system an opportunity to make a fresh start. (Memorandum, Nov. 4, 1975, p. 8.)

The people of Detroit, who have so willingly given their support, deserve to have erased from public view any possible blemish which might otherwise attach to this court's future orders.

As a basis for our recusal, plaintiffs have cited 28 U.S.C. § 455 as amended in 1974 by Public Law 93–512 (hereinafter the 1974 amendments). Prior to the 1974 amendments, § 455 in pertinent part provided:

Any justice or judge of the United States shall disqualify himself in any case in which he . . . is so related or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceedings therein.

As amended, the relevant portion of the statute now provides:

Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Section 3 of the 1974 amendments provides that:

This Act shall not apply to the trial of any proceeding commenced prior to the date of this act [December 5, 1974] . . . .

This proceeding commenced long before December 5, 1974, and plaintiffs' motion was not filed until November 1976. In similar situations, other courts considering § 455 have disagreed over the effect of the amendment. *Compare Duplan Corp. v. Deering Milliken, Inc.,* 400 F.Supp. 497, 505 (D.S.C.1975) ("[t]he act by its own terms does not apply . . .") *with Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1277 (W.D.Pa.1975) (amendment is applicable because it liberalizes the disqualification procedure). The only reported appellate decision that directly considers the applicability of the 1974 amendments to trials of cases commenced before the effective date is *In re Virginia Electric & Power Co.* (VEPCO), 539 F.2d 357 (4th Cir. 1976). The trial judge was a customer of plaintiff VEPCO. Under a fuel adjustment clause VEPCO's customers were directly surcharged an amount which VEPCO claimed as damages. If VEPCO was successful in the action, it might have been required to refund to its customers that part of the damages recovered which represented the surcharge. The trial judge considered defendant's motion to recuse, and, although he did not doubt his impartiality, he disqualified himself on the basis of the 1974 amendment. The Fourth Circuit Court of Appeals reversed, holding that the trial judge, in disqualifying himself, disregarded the clear language of the statute and committed an error of law. 539 F.2d at 366. We agree with the reasoning of the Fourth Circuit, and, accordingly, conclude that § 455, as amended, is not applicable to this motion. *See In re Continental Vending Machine Corp.,* 543 F.2d 986, 995n.4 (2d Cir. 1976), which, without directly considering the issue notes the inapplicability of the 1974 amendments.

Although we find § 455 inapplicable, we think it necessary to comment on it further in the interest of completeness. The 1974 amendments codify Canon 3C of the American Bar Association Code of Judicial Conduct. Prior to the amendments, it was unclear whether the code conflicted with the statute. Mr. Justice Rehnquist saw no material difference between Canon 3C and § 455. *Laird v. Tatum,* 409 U.S. 824 n.1, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Memorandum of Mr. Justice Rehnquist). Prior to the amendments, it was the practice of many district judges to recuse themselves on their own motion when they believed there would be an appearance of partiality.[4] Other

---

4. A law review survey taken prior to the 1974 amendments reported that, of 30 chief judges

responding to a questionnaire, 24 indicated that it was the practice in their district for judges to

judges, however, after carefully considering whether there would be any impropriety in their sitting on a case (including the appearance of partiality) have relied upon the "duty to sit" in denying recusal motions. These judges recognized that the basis of the duty to sit is a duty not to use disqualification as an easy method of avoiding complex or burdensome cases. Nevertheless, leading commentators on disqualification have found a conflict between the code and the statutory duty to sit. *See, e. g.,* Frank, *Commentary on Disqualification of Judges-Canon 3C,* 1972 Utah L.Rev. 377, 388. It is apparent that some judges have viewed the duty to sit as a paramount consideration which overrides their discretion on disqualification. The example most often cited is *Edwards v. United States,* 334 F.2d 360 (5th Cir. 1964), *cert. denied,* 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965). In *Edwards,* Judge Rives considered whether he should recuse himself from an *en banc* hearing of a three-judge panel decision from which he had dissented. The other judges making up the panel could not sit on the *en banc* hearing. Judge Rives wrote the *en banc* opinion reversing the panel. In so doing, he addressed his possible recusal:

> After such study as I could give the matter, I reached the conclusion that whether a judge should recuse himself in a particular case depends not so much on his personal preference or individual views as it does on the law, and that, under the law, I have no choice in this case.
>
> \* \* \* \* \* \*
>
> If either or both of the other judges who participated in the original decision could sit on the en banc hearing there could be no question that I must also sit. While their absence makes me prefer not to sit, I have not found that it furnishes me any legal excuse. 334 F.2d at 362n.2.

When the 1974 amendments were enacted, Congress viewed the duty to sit as conflicting with the code. Congress sought to resolve what it perceived as a judicial dilemma whereby a judge is "forc[ed] . . . to decide either the legal issue or the ethical issue at his peril." H.R.Rep. No. 93–1453, House Judiciary Committee, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News 6351, 6352. Thus, Canon 3C was designed to eliminate the duty-to-sit concept as a restriction on the proper exercise of judicial discretion in recusal motions. In so providing, Congress cautioned:

> While the proposed legislation would remove the "duty to sit" concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.
>
> At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. *Id.* at 6355 (emphasis in original).

The ultimate issue committed to the exercise of sound judicial discretion is whether a reasonable man would infer that the judge's impartiality is, under all the circum-

---

disqualify themselves to avoid an appearance of partiality even though they did not believe their circumstances fell within any of the prescriptions of 28 U.S.C. § 455. *See* Comment, *Disqualification for Interest of Lower Federal Court Judges: 28 U.S.C. § 455,* 71 Mich.L.Rev. 538, 570 (1973). It is interesting to note that the chief judges indicated that the overwhelm-

ing majority of disqualifications were on the trial judge's own motion, rather than as a result of prompting by the parties. *Id.* at 569. This practice has also been noted by appellate courts reviewing lower court rulings on recusal motions. *See, e. g., Action Realty Co. v. Will,* 427 F.2d 843, 845 (7th Cir. 1970), *citing Green v. Murphy,* 259 F.2d 591, 595 (3d Cir. 1958).

stances, subject to question. *Parrish v. Board of Commissioners,* 524 F.2d 98, 108 (5th Cir. 1975); *Bumpus v. Uniroyal Tire Co.,* 385 F.Supp. 711, 714 (E.D. Pa. 1974); *see also United States v. Ritter,* 540 F.2d 459 (10th Cir. 1976).

The decisions of other judges having to consider their recusal can provide us with guidelines, but, unlike decisions governing other issues of law, they cannot directly control the question we must resolve.

[T]hese cases . . . illustrate . . . the wisdom of having individual judges decide the question of their own disqualification in a given case. It may well be that introspection will dictate either recusal or non-recusal in circumstances where other judges would reach the opposite conclusion based on their necessarily incomplete knowledge of the situation. *United States v. Mitchell,* 377 F.Supp. 1312, 1323 n.8 (D.D.C.1974) (Sirica, C. J.).

In *United States v. Mitchell, supra,* the defendant requested the recusal of Chief Judge Sirica on the grounds that he had had prior contact with the proceedings at the grand jury stage, that he had met with the special prosecutor and prosecution personnel in the absence of defense counsel, and that he had met with columnist Jack Anderson following publication by Mr. Anderson of grand jury minutes. Judge Sirica explained that his prior contact with the case occurred through his duty as chief judge to supervise grand jury proceedings, that the meetings with the special prosecutor were also necessitated by his grand jury duties, and that the alleged meeting with Mr. Anderson was actually a meeting with his attorneys resulting in the cessation of publication of the secret grand jury minutes. Judge Sirica concluded that each of the activities cited was the result of his judicial activities rather than evidence of personal prejudice. Accordingly, he denied the motion for recusal.

In *Bradley v. School Board (Richmond, Virginia),* 324 F.Supp. 439 (E.D.Va.1971), a school desegregation case, suburban defendants sought the recusal of Judge Merhige on the ground that he wrote a letter to plaintiff's counsel suggesting that it might be appropriate for the defendant school board to discuss the feasibility of consolidating two or more school districts with the appropriate officers of contiguous counties. Thereafter, the Richmond defendants moved to file a third party complaint joining certain suburban counties as parties defendant. The suburban defendants contended that the letter and subsequent press accusations that Judge Merhige was responsible for the Richmond defendants' third party complaint created a public impression of bias. Judge Merhige held that, even assuming that the allegations were true, they did not indicate prejudgment of any factual issue in the case. In deciding that neither 28 U.S.C. § 144 nor § 455 necessitated his disqualification, Judge Merhige indicated that, in writing the letter, he was fulfilling his obligation "to assist the litigants in the case in any appropriate manner to the end that the law is conformed to." 324 F.Supp. at 448. Noting that suggestions of the manner by which a unitary school system may be achieved are made in a variety of ways by courts in school desegregation cases, Judge Merhige concluded that his actions were not grounds for recusal. Moreover, he found an obligation not to use disqualification as a means of avoiding the great personal burdens imposed upon him. This obligation was particularly compelling "when a single judge has acquired, by experience, familiarity with a protracted, complex case, which could not easily be passed on to a second judge." *Id.* at 449.

In *United States v. Quattrone,* 149 F.Supp. 240 (D.D.C.1957), while noting that recusal was not required, Judge Youngdahl recused himself observing that although the appearance of judicial impropriety was not great, the availability of other judges to handle the case, the ease of transfer, and the negligible delay and inconvenience caused by a transfer to another judge would warrant it. *Compare United States v. Garrison,* 340 F.Supp. 952 (E.D.La.1972).

In *United States v. Board of School Commissioners (Indianapolis, Indiana),* 503 F.2d

68, 80–81 (7th Cir. 1974), the court affirmed the trial judge's denial of a motion to recuse despite allegations that he had prejudged the state's liability and so stated in a newspaper interview. That interview quoted the trial judge as stating that he had involved the city's peripheral districts in a school desegregation suit because housing patterns caused a racial imbalance in the Indianapolis schools. The court reasoned that the remarks were derived from proceedings before the court rather than attitudes or conceptions formed outside the courtroom.

█ ¨ Finally, plaintiffs suggest that this court's actions have violated Canon 3A(4) of the Code of Judicial Conduct. That Canon provides:

> A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

This Canon is concerned with protecting the adversarial nature of judicial proceedings. The drafters were primarily concerned with actions similar to those related in Schick, *Judicial Relations on the Second Circuit, 1941–1951,* 44 N.Y.U.L.Rev. 938, 941–47 (1969); Thode, *Reporter's Notes to Code of Judicial Conduct 52–54* (1973). Those actions involved consultation with persons not connected with the court on issues then pending before the court. For example, Mr. Schick cites various memoranda be-

tween Judges Frank and Clark concerning the resolution of an appeal in *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946). That appeal involved allegations by plaintiff that defendant Cole Porter had plagiarized plaintiff's musical composition. Judge Clark advised Judge Frank that he had given the sheet music to a friend who was a professor of music at Yale University, and that his friend had concluded that it was impossible for the defendant's songs to have been plagiarized. The activities challenged by the instant motion, however, are clearly not the type of actions which the Canons prohibit.[5]

Upon examination of plaintiffs' motion, we find it necessary to comment on some of the factual assertions made. As Mr. Justice Rehnquist indicated, the judge to whom the motion is addressed, with his recollection refreshed by the motion and the record, presumably knows more about the factual background of his involvement in matters that form the basis of the motion than do the movants. *Laird v. Tatum,* 409 U.S. 824, 824 n.1, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Memorandum of Mr. Justice Rehnquist). Plaintiffs' first assertion, that prior to the filing of our August 15, 1975 opinion we met *ex parte* with representatives of the Detroit Board of Education and its counsel to discuss that opinion, is not correct. On August 15, 1975, at 8:45 A.M., a deputy clerk was directed to hand deliver plaintiffs' copy of our opinion to postal officials for delivery no later than 10:00 A.M. Saturday morning, August 16, 1975. (See postal receipt attached to this memorandum.)[6]

---

5. Our research discloses that the authorities who have struggled with the question of *ex parte* communications share a common concern regarding the point at which such activity becomes improper. *See, e. g.,* A.B.A. Standards for Criminal Justice, The Function of the Trial Judge § 1.6. The concern is most acute where the communications involve pending contested issues. *United States v. Huff,* 512 F.2d 66 (5th Cir. 1975); *Haller v. Robbins,* 409 F.2d 857 (1st Cir. 1969); *see* Webster, *The Use of Economic Experts in Antitrust Litigation,* 32 F.R.D. 99, 102 (1962); *cf. Camero v. United States,* 375 F.2d 777, 179 Ct.Cl. 520 (1976). Although there does not appear to be a consensus regarding the precise boundary between the proper and the improper, it is clear that the

trial judge is not required to be inert; nor is he compelled to act as if he were merely presiding at a sporting match. *United States v. Green,* 544 F.2d 138, 147 (3d Cir. 1976). This is particularly so in the case at bar, where we were peripherally involved in matters which could not affect the outcome of contested issues but which had a great effect on this court's ability to enforce its orders.

6. That receipt indicates that Detroit postal officials received the opinion at 10:15 A.M. on August 15, 1975. We are not aware why the court's messenger delayed delivery to postal officials until 10:15 A.M. Postal authorities, however, had assured the court's staff that delivery could be effected by 10:00 A.M. at the

Simultaneous therewith, our opinion was filed in the Clerk's Office with directions to file and make an additional 50 copies.

At 11:00 A.M. on that day, approximately 2½ hours after the opinion had been filed, we summoned the President of the Detroit Board of Education, its General Superintendent and its counsel for a status report on negotiations pending with the Detroit Federation of Teachers and a threatened strike. We were greatly concerned because a teacher strike resulting in the closing of schools would disrupt the Board's desegregation effort and severely impede community acceptance of the desegregation plan. We fully explained that conference in our August 18, 1975 memorandum. The discussion concerned only the possibility of a strike delaying the opening of schools. The contents of the court's August 15, 1975 opinion were not discussed at that meeting, nor was there any reason to do so. Since the defendant Detroit Board's copy of the opinion had not been deposited in the mail, counsel was served with its copy. The court requested counsel not to disclose that he had received his copy until the next day when plaintiffs' counsel would receive their copy.[7] Counsel for plaintiffs received a copy of our August 18, 1975 order and were well aware of the court's meeting with the Detroit Board. There was no attempt to conduct that meeting in secret as plaintiffs now assert. On August 18, 1975, we ordered the Detroit Board and the Detroit Federation of Teachers to meet daily to negotiate a settlement of the disputed issues and we further ordered all the parties and their counsel to appear on August 27, 1975 and submit a current status report on those negotiations.[8]

Similarly, plaintiffs' second assertion is inaccurate. Our efforts to obtain community support for Detroit's desegregation plan did not require us to *secretly* inform numerous individuals and groups of the contents of our opinion. As plaintiffs indicate in their motion, this court's contacts with members of the community were documented as appendices to our opinion of August 15, 1975. The appendices do not support the assertion that we solicited views in support of that opinion, or that we continued to meet with various community groups after our August 15, 1975 opinion. Rather, pursuant to our order of April 15, 1975, we assigned Dean Wilbur Cohen the task of meeting with the presidents of all Michigan universities and colleges to discuss with them the various ways in which post-secondary institutions in Michigan could cooperate in furthering quality education in the Detroit city schools. On June 18, 1975, a number of university and college represent-

Main Post Office in Memphis, Tennessee on August 16, 1975 by Express Mail. Plaintiffs' counsel's secretary was advised that it would be necessary to pick up the copy of the opinion at the Main Post Office in Memphis. It does appear that there is an error in the covering letter enclosing counsel's copy of the opinion. It states: "The original opinion will be filed at 9:00 A.M. Saturday, August 16, 1975." It is understandable that an understaffed court, acting hastily to meet a deadline, may occasion such errors. It is clear that the opinion itself is time stamped as filed on August 15, 1975.

7. We recognize that this degree of concern for plaintiffs' counsel was not an obligation of the court, but in view of the fact that a press conference was planned to give an accurate report of the desegregation plan to the public, we believed plaintiffs' counsel should have their copy in the event they were called by the local press. It is true that counsel for the Detroit Board decided to discuss the opinion with Board members during the evening hours

of August 15, 1975 as he had a right to do. He is to be commended for not disclosing to Board members the fact that he had been served with his copy as requested by the court. This left the erroneous impression, however, that counsel received his information about the opinion from the court.

8. Despite our ordering all parties to appear on August 27, 1975, plaintiffs elected not to do so. As a consequence of the meeting on August 27, 1975 with all defendants present, the court entered an order the following day, August 28, 1975, which provided that teachers would be assigned to achieve a distribution of not more than 70% of teachers of one race in each school. Thus, as a result of the court's efforts, the parties were able to negotiate a contract, a strike was averted, the Detroit city schools opened on the appointed date, and the school district was able to obtain federal grants amounting to several million dollars.

atives met in the court's jury room. We briefly appeared to welcome those present and express the court's gratitude for their willingness to cooperate. The meeting was conducted thereafter by Dean Cohen. At our request, Dean Cohen attempted to persuade each university president to enter into separate agreements detailing the areas in which the particular university could be of assistance to specific Detroit schools. We did attend a luncheon meeting with various business, community and labor leaders to encourage them to support the Detroit Board's effort to deliver quality education. We neither solicited views from these individuals nor did we disclose what the opinion might contain.

■ We took these actions so we could include in our opinion the fact that a large segment of the community was willing to support a desegregation effort. It is the court's duty to take whatever steps are essential to assure that its desegregation orders are peacefully implemented. In addition to what we have detailed here, and before the hearings on the remedial phase of this litigation began, we requested the Community Relations Service of the United States Department of Justice to assist the City of Detroit and the court in achieving the harmonious implementation of the court-ordered desegregation plan for the Detroit city schools (Order, Apr. 30, 1975). We recognized early that a successful desegregative effort required the cooperation and support of the entire community (Memorandum Opinion, Nov. 4, 1975, p. 8). The entire structure created by our August 15, 1975 opinion was designed to accomplish the peaceful desegregation of the Detroit city schools.

■ Where, as here, the parties fail to agree on a remedial decree, the court may not abandon its responsibility to assure that its desegregation orders are voluntarily obeyed. Compliance is more assured when large segments of the community indicate their support. Community support can help to ease the tension created by a transition to a desegregated system. The alternative would be the difficult, if not impossible,

task of enforcing a decree in the midst of violent responses. It is not uncommon for trial judges fashioning a decree to seek additional help to assure its voluntary acceptance. *Knight v. Board of Education,* 48 F.R.D. 115 (E.D.N.Y.1969) (the appointment of masters); *Morgan v. Kerrigan,* 401 F.Supp. 216 (D.Mass.1975) (the appointment of masters); *Calhoun v. Cook,* 362 F.Supp. 1249 (N.D.Ga.1973) (creation of a biracial committee to assist in drafting the decree and supervising implementation); *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972) (outside experts provided the court with information); *aff'd in pertinent part sub nom. Wyatt v. Aderholdt,* 503 F.2d 1305 (5th Cir. 1974); *see also Hart v. Community School Board,* 383 F.Supp. 699 (E.D.N.Y. 1974). It is beyond question that these courts were able to enter desegregation orders without affecting their ability to remain impartial. Where liability has been found, the court is obliged to afford plaintiffs in a desegregation case a constitutional remedy that creates a unitary system and repairs the effects of past segregation. *See generally,* Chayes, *The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281, 1298–1302 (1976).

In their motion, plaintiffs indicate concern that the court has received numerous *ex parte* communications. We wish to assure all counsel that this court's staff is now and always has been under instructions not to deliver to the court any communication pertaining to contested matters pending before the court. For example, during the hearings on the defendant Detroit Board's motion to enjoin the use of the Evangeline Residence for Women as a correctional facility, we stated:

One other thing the court would like to state to all counsel. There is here, an envelope handed to me by my secretary who, of course, handles all the mail received by the court. She only identified this as mail that she has received in connection with this particular issue. And it came in after the issue was printed in the newspapers. I assure each of the counsel that the court has not read these. As you

well know, courts do not answer letters and courts are not permitted to receive letters. And I just did not know what to do with them. I am going to turn them over to counsel. They are yours to do with as you wish (Tr. May 7, 1976 at p. 12).

Plaintiffs also allude to communications between the court and the defendant Detroit Board of Education after this court's August 15, 1975 opinion. Plaintiffs construe as *ex parte* communications various submissions and pleadings filed by the defendant Detroit Board in response to this court's orders. In so doing they reiterate, as grounds for recusal, objections which they have previously voiced in this court and in the Court of Appeals.

Plaintiffs continue to misinterpret the holdings of this court. Plaintiffs have not been improperly excluded from the shaping of the remedy. The first time plaintiffs voiced this as an objection was in a pleading entitled "Objections to the Order of August 15, October 8, 1975 and Motion for Hearing on October Submission," filed October 14, 1975. At that time and thereafter, plaintiffs sought to relitigate this court's guidelines of August 15, 1975. Plaintiffs have never alleged that the submissions of the Detroit Board did not comply with our August 15th guidelines. We have repeatedly emphasized that the adversarial phase of this litigation ended with the issuance of our guidelines on August 15th. The Detroit Board, having the primary obligation to desegregate, was obliged to submit proposals conforming to those guidelines. Plaintiffs had every right to object to the defendant's proposals on the ground that they violated those guidelines. Plaintiffs' role was similar to an advocate urging upon the court that his adversary should be held in contempt for violating an order of the court. In both cases, the ultimate resolution is a matter between the alleged violator and the court. The appropriate forum for contesting the validity of the guidelines was the Court of Appeals. Indeed, were this court to have considered plaintiffs' objections to the guidelines, we would have improperly interfered with the jurisdiction of the Court of Appeals. Accordingly, we denied plaintiffs' request for a hearing:

Plaintiffs have not alleged that the Detroit Board's September 19, 1975 reassignment plan is not in accordance with the guidelines set forth in the court's order of August 15, 1975; rather, plaintiffs' current objections are identical to the contentions they made during the lengthy remedial hearings in this cause, which were fully addressed by this court in its memorandum opinion of August 15, 1975 [citation omitted].

The court's detailed findings of fact and conclusions of law are now on appeal and plaintiffs may direct any objections they have to the U.S. Sixth Circuit Court of Appeals. It is for that court to determine whether, as this court has found, the guidelines effectively desegregate, whether, as the Detroit Board contends, they should be amended, or whether as plaintiffs contend, they should be reversed. The sole function remaining for this court is to determine if the Detroit Board's revision of its desegregation plan conforms to the court's guidelines and brings into equitable balance the practicalities of the situation. Since plaintiffs have not even addressed the issue of whether the Detroit Board is in compliance with the guidelines contained in the court's August 15, 1975 order, they are clearly not entitled to a hearing at this time. Memo. Op., October 31, 1975 at 2.

We reiterated our conclusion seven months later:

While the revised plans were under consideration, the plaintiffs requested a hearing to document their objections. However, it was our view that a hearing would not be appropriate. The adversarial phase of this litigation ended with the August 15, 1975 partial judgment; the issue of the conformance of the revised plan with our guidelines was an issue solely between the defendant Detroit Board and the court. Memo. Op., May 11, 1976 at 2n.2.

Plaintiffs' misinterpretation of our prior orders aside, the fact remains that this

court did not communicate with the defendant Detroit Board through any medium other than our orders and the Board's submissions in response thereto. The issue of an appropriate remedy posed a complex polycentric problem. We, therefore, appointed three desegregation experts to "serve as officers of this court and . . . assist in the study and evaluation of said desegregation plans and perform such other service as said experts deem advisable or as the court may from time to time direct." (Order of April 15, 1975.) Consistent with this order, we referred all submissions of the Detroit Board which culminated in our order of November 4, 1975 to our duly appointed expert for preliminary analysis. Plaintiffs have never objected to the appointment of experts or to the purpose for which they were appointed. We are convinced that this procedure was proper and that neither the court nor its experts committed any improprieties in carrying it out. For an excellent scholarly discussion of the procedural problems involved in the handling of the remedial phase of a desegregation case, see Judge Weinstein's opinion in *Hart v. Community School Board, supra,* at 764–67, *appeal dismissed* 497 F.2d 1027 (2d Cir. 1974).

Thus, every incident of which plaintiffs complain was not directly related to the contested issues in this case, and resulted solely from judicial activities designed to ensure a community climate receptive to this court's orders. A court presiding over the desegregation of a school system in a major city must act firmly within its discretion to fulfill its obligations under the law. *See, e. g., Bradley v. School Board (Richmond, Virginia), supra; United States v. Board of School Commissioners (Indianapolis, Indiana), supra.* Our actions were well within our discretion and were based on substantial precedent. *See Hart, supra* (New York City Police Commissioner ordered to provide adequate protection for children attending desegregated schools). We sought to avoid the formality of an order. With respect to the local colleges and universities, no such order was possible as they were not parties to this action. Nor

do we know how it would be possible to order community support. In *Morgan v. Kerrigan, supra,* the court detailed the actions it took in its quest to formulate an effective desegregation remedy and stated:

> While [the court] has obligated the Boston School Committee and its department to eliminate segregation and the effect of discrimination in the public schools, it has also solicited the talent, support and assistance of colleges, universities and business and other organizations in developing learning opportunities that will remedy the losses students have already suffered and that will lay a basis for improving the quality of education for the total City. 401 F.Supp. at 223–24.

Recognizing that community response plays an important part on the impact of a mandatory transportation order, the court, at several places in its opinion, expressed its appreciation for the cooperation colleges, universities, and business and community groups had offered. *Id.* at 231, 234–35, 247, 249.

We have carefully applied to the facts presented in plaintiffs' motion all the criteria for determining whether recusal is proper and have concluded that it is not. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Pfizer, Inc. v. Lord,* 456 F.2d 532 (8th Cir. 1972); *cf.* Annot., 2 A.L.R. Fed. 917 (1969).

> Were the rule otherwise, a judge in an extended and multi-segmented . . . case like this one . . . would be forced, for no sound reason, to disqualify himself as to the entire case, leading to wasteful duplication, delay and expense. *In re Continental Vending Mach. Corp., supra,* 543 F.2d at 995.

We were assigned this case following the untimely death of Judge Stephen Roth. At that time, we spent many hours to familiarize ourself with all prior proceedings. Since that time, there have been additional hearings, remedial orders have been issued, and an appeal has been perfected to the United States Court of Appeals for the Sixth Circuit. The sacrifices that we made when this case was transferred would be small

compared to the sacrifices another judge would have to make should this case be transferred again. The delay and chaos which recusal and transfer would create and the ensuing prejudice to plaintiffs' rights are incalculable.

Having concluded that recusal based upon plaintiffs' motion is unwarranted, we feel compelled to raise *sua sponte* the possible appearance of bias or prejudice were we to preside over the consideration of faculty assignments. Our concern is based on the silence of the record with respect to the circumstances surrounding our order of August 28, 1975. The record only shows an *ex parte* meeting with defendant Detroit Board on August 15, 1975, followed by an order of August 18th directing the parties to appear for a status report on August 27th, followed by the order of August 28, 1975. By virtue of the remand of the Court of Appeals, hearings on the issue of faculty assignments may be required. *Bradley v. Milliken, supra,* 540 F.2d at 247. We must now consider whether the record gives the appearance that, as a result of our meeting with the Detroit Board on August 15, 1975, we have prejudged the issue of faculty reassignments and concluded that the proper remedy is as contained in our August 28th order. We, therefore, deem it essential to set forth our recollection of the circumstances that precipitated the order of August 28, 1975.

The record discloses that at first we declined to order any faculty reassignments. In our August 15, 1975 opinion we observed:

> There is certainly insufficient evidence in this record to justify a finding that the ordinary administrative and collective bargaining processes of the parties will not satisfy the necessity of having a proper racial mix among the teaching staff of the school district. *Bradley v. Milliken,* 402 F.Supp. 1096, 1122 (E.D.Mich.1975).

In so ruling, we agreed with the position taken by the plaintiffs. In a critique of the Detroit Board's proposals, the plaintiffs stated:

> The Board and Union have made no attempt to determine if, under the present contract and given Court required pupil changes, they may find that the needed faculty reassignment can be accomplished without Court intervention [sic]. Plaintiffs want no part in the resolution of collective bargaining disputes, unless and until they interfere with Constitutional rights of pupils. This Court should be equally loath to intervene, unless necessary. (Plaintiffs' Response to Submission by Detroit Board, April 21, 1975, p. 21.)

Nevertheless, following three status report meetings with the parties, we issued an order on August 28, 1975, directing distribution of faculty of no more than 70% of teachers of one race in each school.

The proceedings were not *ex parte* and did not include discussions of the issue of faculty reassignment. Although plaintiffs were not summoned for the meeting of August 15, 1975, we have already indicated that the sole purpose for the meeting was to inquire into the status of the contract negotiations between the Detroit Board and the Detroit Federation of Teachers (Federation). The court learned that certain economic and non-economic issues were yet to be resolved. We ordered the Board and the Federation to meet daily to negotiate a settlement because we were not satisfied that there had been a concentrated effort to resolve the dispute (Memorandum and Order, August 18, 1975). It is significant that the first ordering clause, dealing with negotiations for a new contract, was addressed only to the Board and the Federation. The second ordering clause, calling for a court appearance and the submission of a status report, was addressed to *all the parties.* Thus, plaintiffs were aware of the conference on August 27th through our order of August 18th but they chose not to appear. There was an interim meeting on August 22nd requested by the Federation and all parties were invited to attend (see appended letter from Theodore Sachs, Esq., to all counsel). Plaintiffs elected not to attend the meeting of August 22nd. Our participation at these meetings was minimal and designed merely to afford the par-

ties the court's services in resolving a contract dispute.[9] We did not discuss any of the contested issues. As a consequence of the morning meeting of August 27th, the Board and the Federation presented a proposal which they had jointly formulated.[10] It appeared, however, that both sides were unable to compromise the issue through the collective bargaining process, and were fearful of jeopardizing their position in this litigation by stipulating to an order settling the matter. We signed the proposed order which was presented to the court for the purpose of furthering compliance with our partial judgment of August 15, 1975 by averting a teacher strike.[11] Such an order is entitled to little weight in subsequent proceedings. *See Ex parte United States,* 101 F.2d 870, 874 (7th Cir.), *aff'd sub nom. United States v. Stone,* 308 U.S. 519, 60 S.Ct. 177, 84 L.Ed. 441 (1939). The order of August 28th can receive no weight since it has been vacated by the Court of Appeals.

■ Even if the conferences were *ex parte,* recusal is not warranted because they did not involve discussions of disputed issues or trial strategy. *Viviano Macaroni Co. v. F. T. C.,* 411 F.2d 255 (3d Cir. 1969); *United States ex rel. Paris v. Brierley,* 315 F.Supp. 1392 (W.D.Pa.1970); *see also Howell v. Jones,* 516 F.2d 53, 57 (5th Cir. 1975); *compare McFadden v. United States,* 63 F.2d 111 (7th Cir. 1933). As the Court of Appeals for the First Circuit stated in a similar context:

> [A] judge may be exposed to ex parte assertions which he passes on, not for their truth. . . . To say that such exposure disables that judge as a matter of constitutional law from presiding over a subsequent jury trial, because he may consider the ex parte representations in imposing sentence, seems to us to expand the policy of insuring the purity of the

court to the point of eliminating faith in it. *Glynn v. Donnelly,* 485 F.2d 692, 694 (1st Cir. 1973).

■ In considering whether the record gives the appearance that, as a result of our meeting of August 15, 1975, we have prejudged the issue of faculty reassignments, we have attempted to set our involvement in this case aside and resolve the issue from the viewpoint of the fictional "reasonable man." We concede that, for us, it is a difficult task. We have lived with this case since January 6, 1975, and our involvement, due to the protracted nature of this litigation, has been more extensive than that required in a typical lawsuit.

We have determined that bias or prejudice exists neither in fact nor in appearance. We have recognized that faculty assignments would be necessitated by student reassignments. *Bradley, supra,* 402 F.Supp. at 1144. The record clearly demonstrates our attitude and conduct with respect to *ex parte* communications relevant to such issues. See discussion *supra,* at p. 937. In our view, it would not be reasonable to conclude that we have prejudged the issue of faculty assignment.

Apparently, plaintiffs agree with our conclusion. Although their motion sets forth numerous assertions and conclusory allegations, plaintiffs only contend that there is a general appearance of partiality. They have never directed our attention to the specific issue of faculty assignments and our prior actions with respect thereto.

Unlike plaintiffs' contentions, which clearly lack merit, the matter which we raise presents a close question.

A judge receiving a communication about a proceeding that is not before him should, however, be aware that if the

---

9. Our participation at these meetings was less involved than that normally engaged in by a court where it seeks to assist the parties in settling litigation at pre-trial conferences. Such judicial efforts do not affect the impartiality of the court when it later presides at the trial.

10. It is our recollection that upon inquiry by the court, the parties indicated that the text of the proposed order was read to plaintiffs' counsel.

11. Upon review, a panel of the Court of Appeals could not discern the procedural background of the order.

proceeding does come before him in the future any present communication about the proceeding *might* require his disqualification at that future point by reason of Canon 3C(1) . . . . Thode, *supra,* at 53 (emphasis added).

We, therefore, find it preferable to refer this matter to the Chief Judge of this Court for resolution or assignment to another judge for that purpose. We sincerely regret that this action casts an additional burden upon one of our already overladen colleagues. We are confident, however, that they, like us, are concerned that every possible tinge of partiality, no matter how remote, be thoroughly and openly examined. Another judge can, absent the inhibition of this court's extended involvement in this litigation, more easily evaluate the matter from the viewpoint of the neutral "reasonable man." Another judge, moreover, may supplement the record if necessary. This action does not lack precedent [12] and we think it essential. The foundation of our adversary system is strengthened by the public's confidence in the judiciary. Nothing undermines that foundation more than a presiding judge who gives the appearance of partiality. Although we stand willing and able to proceed in this matter and are anxious to avoid any further delay, our respect for our system of law compels us to seek another opinion.

Accordingly, IT IS ORDERED that plaintiffs' motion to recuse be and the same hereby is denied;

IT IS FURTHER ORDERED that the question whether there exists an appearance of partiality rendering it improper for this court to preside over the issue of faculty assignments be and the same hereby is referred to the Chief Judge of this District for resolution or assignment to another judge of this court.

## APPENDIX

### ATTACHMENT #1

| FROM: | | |
|---|---|---|
| Name | Judge Robt. F. Dimascio | |
| Address | U.S. District Ct. | |
| City | Det. | State Mich Zip 48226 |

POST OFFICE TO POST OFFICE

ORIGIN:

Initials of Receiving Clerk *el*

PO Zip **48216**

Date In **8-15-75**

Time In **10:15 A.M**

Weight 2/2 lbs. Postage 2.75

**A848059**

**SERVICE GUARANTEE EXPRESS MAIL POST OFFICE TO POST OFFICE (Option V)**

Mailings meeting the Terms and Conditions applicable to this service will be accepted for express shipment to a receiving postal facility for next day pick-up by, the addressee after a time specified by the Postal Service at the time of mailing. This service is available only at designated postal facilities. Mailings and pick-ups may be made only during the regular lobby hours of those facilities. If a mailing is deposited by a specified deadline and is not available for claim by the addressee at the time specified for pick-up, the sender may obtain a full refund of the postage and fees paid, regardless of the reason for the delay.

HOLD FOR: Louis R. Lucas Esq.

Name

AT: Main Office 555 So. Third

Station/Branch

City Memphis State Tenn Zip 38101

**EXPRESS MAIL SERVICE CUSTOMER RECEIPT**

Label 11A APR 74

---

**12.** Although we have been unable to uncover a case where such a referral has been made when the question of the presiding judge's disqualification was raised *sua sponte,* such referrals have been made for consideration of recusal motions filed by the parties pursuant to 28 U.S.C. § 144. *United States v. Grinnell Corp., supra,* 384 U.S. at 582 n.13, 86 S.Ct. 1698 (reference by district judge to chief circuit judge); *Tenants and Owners in Opposition to Redevelopment v. H.U.D.,* 338 F.Supp. 29 (N.D.Cal. 1972) (reference to chief judge). Additionally, we do not view the language of 28 U.S.C. § 455 which requires the district judge disqualify himself where it would be improper "in his opinion" to preside as precluding this referral. That language simply commits the handling of the situation to the judge's discretion. In our discretion, we believe the ultimate result should be decided by another judge.

ATTACHMENT # 2

## MARSTON, SACHS, O'CONNELL, NUNN & FREID, P. C.

ATTORNEYS AND COUNSELORS AT LAW

1000 FARMER

D. CHARLES MARSTON
THEODORE SACHS
ROBERT L. O'CONNELL
JEANNE NUNN
BERNARD M. FREID
MELVYN J. KATES
A. DONALD KADUSHIN
ROLLAND R. O'HARE
RONALD R. HELVESTON
BARRY P. WALDMAN
ROBERT G. HODGES
W. KENNETH WRIGHT
DAVID K. BARNES
RALPH O. JONES
DAVID J. DUTHIE
LUCIAN J. HENRY
DOUGLAS W. JOHNSON
JOHN L. ZORZA
EILEEN NOWIKOWSKI

DETROIT, MICHIGAN 48226

(313) 965–3464

August 20, 1975

PONTIAC OFFICE
302 PONTIAC STATE BANK BLDG.
PONTIAC, MICHIGAN 48058
(313) FEDERAL 4–0582

SAGINAW OFFICE
210 BEARINGER BUILDING
SAGINAW, MICHIGAN 48607
(517) PLEASANT 4–3110

FLINT OFFICE
201 PHOENIX BUILDING
801 S. SAGINAW
FLINT, MICHIGAN 48502
(313) 233–4202

Louis R. Lucas, Esq.
525 Commerce Title Building
Memphis, Tennessee 38103

George McCargar, Esq.
Assistant Attorney General
750 Law Building
Lansing, Michigan 48913

George Roumell, Esq.
7th Floor, Ford Building
Detroit, Michigan 48226

RE: Bradley v. Milliken

Gentlemen:

This is to confirm the sending of the following wire this date:

"Have requested and scheduled conference with Judge DeMascio and Mr. Roumell Friday, August 22 at 9 A.M. to discuss collective bargaining prooblems in light of Court's Supplemental Memorandum and Order dated August 18. You are invited to attend if you wish."

Yours very truly,
/s/ Theodore Sachs

TS:ek
opeiu-42, afl-cio
cc: Hon. Robert DeMascio

## ORDER CONCERNING REFERRED ISSUE

CHURCHILL, District Judge.

In his Memorandum Opinion of January 21, 1977, concerning a recusal issue, Judge Robert E. DeMascio, sua sponte, raised an issue whether there is an appearance of partiality resulting from the circumstances surrounding the Court's order of August 28, 1975, which renders it improper for him to preside over the issue of faculty assignments in the above entitled cause. (See pages 940 to 943 of the opinion.) The inappropriateness of his recusal from the case and the fact of his ability to impartially determine the faculty assignments issue

are established by the Memorandum Opinion itself.

On February 9, 1977, Chief Judge Damon J. Keith directed the Clerk of the Court to assign the matter, for the limited purpose referred to in Judge DeMascio's memorandum, to a judge of this court by blind draw. On February 10, 1977, pursuant to Chief Judge Keith's directive, the matter was assigned to me.

Judge DeMascio's Memorandum Opinion contains a recital of the circumstances surrounding the August 28, 1975 order. If any party wishes to assert that the circumstances surrounding the entry of the August 28, 1975 order were materially different from those set forth in the Memorandum Opinion on pages 940 to 943, then such party may file an affidavit or affidavits with respect thereto.

Such affidavits must be submitted, if at all, so as to be received at my office at 211 Federal Building, Detroit, Michigan 48226, by February 24, 1977; and such affidavits should be mailed or delivered directly to me at the above address, together with proof of service of copies thereof by mail on other parties. To the extent that such affidavits may contain recitals of fact upon information and belief, the source of the affiant's information must be set forth.

### MEMORANDUM OPINION AND FINAL ORDER CONCERNING REFERRED ISSUE

■ The procedural history of my limited involvement and responsibility in this case is set forth in an order dated February 14, 1977, and need not be repeated here.

The parties were given the opportunity to file affidavits on or before February 24, 1977. None were filed.

The plaintiffs did file a motion for leave to conduct discovery. Nothing could be served by the kind of discovery sought by the plaintiffs except to delay the final determination of the real issues in this lawsuit, to create confusion, and to create an appearance of partiality which does not exist. One does not need to discover what already appears. One needs merely to look and read.

When one looks at this situation objectively, this is what appears. Judge Robert E. DeMascio scrupulously prepared and, on August 15, 1975, filed a Memorandum Opinion and Remedial Decree in what is perhaps the most publicly controversial case in the history of the state. A strike threatened to disrupt a carefully developed plan for the peaceful integration of Detroit City schools. As carefully outlined in his Memorandum Opinion dated January 21, 1977, Judge DeMascio took reasonable and necessary steps to avoid a strike at the beginning of the 1975–1976 school year.

The order of August 28, 1975, no longer has any effect. There is absolutely no reason for any party or person to suspect that such order or the proceedings preceding its entry will influence Judge DeMascio in the manner in which he conducts further proceedings or in the ultimate determination of the teacher reassignment issue.

It is my opinion that the manner in which Judge Robert E. DeMascio has presided in this case has been exemplary and should command the respect of the parties, counsel, the judiciary, and the public.

It is hereby determined that there is no appearance of any partiality whatsoever on the part of Judge Robert E. DeMascio in this matter. The undersigned's limited involvement in this matter is terminated, and IT IS SO ORDERED.