**In re NEW ENGLAND FISH COMPANY, a Maine corporation, aka NEFCO, Debtor.**

**Bankruptcy No. 80–00864.**

United States Bankruptcy Court,
W.D. Washington.

Dec. 30, 1982.

Nancy P. Gibbs, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for Seattle-First Nat. Bank.

Robert Shutan, Sidley & Austan, Los Angeles, Cal., for Crocker Nat. Bank and Bank of America.

D. Gordon Willhite, Sax & MacIver, Seattle, Wash., for Sam Rubinstein, Trustee.

## MEMORANDUM RE INTEREST AND ATTORNEYS' FEES AND EXPENSES CLAIMED BY BANKS

SIDNEY C. VOLINN, Bankruptcy Judge.

### FACTS

This particular matter involves the claims of three banks, Seattle-First National Bank, Crocker National Bank and the Bank of America National Trust & Savings Association, for additional interest and reimbursement of attorneys' fees and expenses pursuant to 11 U.S.C. 506(b), and certain provisions of a loan agreement dated July 17, 1979.

The debtor, New England Fish Company (NEFCO), on April 23, 1980, filed a Chapter 11 petition under Title 11 of the United States Code. On May 2, 1980 it converted the proceedings to a Chapter 7. The debtor was a major fish processor functioning on an international scale. Its principal offices were in Seattle, Washington. Its assets were considered by the trustee to be worth as much as $70,000,000. When these proceedings were commenced, NEFCO owed the three banks more than $19,000,000. The loans were substantially collateralized by property of the debtor. The trustee has liquidated assets sufficient to pay the principal amount of the loans in full with interest at prime rate plus 2%. He has set aside $300,000 as a reserve for payment of the banks' claims for additional interest, and such attorneys' fees and costs as may be allowed by the court.

The loan agreement was entered into between the debtor and the banks for the purpose of providing a $25,000,000 working capital loan. It was a consortium loan with Seattle-First National Bank having been designated by each bank, irrevocably, as agent to take such actions as might be required of the lenders. The agreement contains a number of provisions dealing with the rights of the banks amongst themselves and as to the agent. Primary responsibility for dealing with NEFCO was therefore placed upon Seattle-First which has its headquarters in Seattle. This bank is one of the major banks in the United States employing personnel with the competency to service loans of the size made to NEFCO.

The loan agreement, *inter alia,* provides in ¶ 9.2 that

"The borrower agrees to pay all out-of-pocket expenses of each bank (including the reasonable attorneys' fees and expenses of each bank counsel) in connec-

tion with the preparation of this loan agreement and of banks (including the reasonable fees and expenses of each bank's counsel) in connection with the enforcement of any provision of this loan agreement and the collection of the note."

## I. INTEREST

The promissory notes held by the three banks provide that interest accrues at the rate of prime plus 3% on July 31, 1980 or upon default, whichever is earlier. The trustee and three banks have agreed that the increased rate of prime plus 3% should be paid according to the terms of the notes after July 31, 1980, until the time the notes were paid in full. The parties have further agreed that the three banks will receive the increased rate of prime plus 3% for one-half of the period between February 2, 1980, the date the banks allege the event of default occurred, and July 31, 1980, the date that the notes by their terms call for a prime plus 3% interest rate. Under this formula, NEFCO owes the three banks $51,022.08 in interest accrued through July 31, 1980. Of this amount, $17,019.18 constitutes the additional 1% from July 31, 1980 until payment in full of the loan principal, and $34,000 is one-half of the accrued interest at the rate of 1% from February 2, 1980 until July 31, 1980. The three banks are therefore entitled to receive $51,022.08 in interest.

## II. ATTORNEYS' FEES AND EXPENSES

Reimbursement for fees and costs are requested as follows:

1. Seattle-First National Bank for attorneys' fees and costs payable to Davis, Wright, Todd, Riese & Jones

| | |
|---|---|
| Fees | $96,253.00 |
| Costs | 5,271.74 |
| Total | $101,524.74 |

2. Crocker National Bank and Bank of America (the banks have agreed to share the fees payable to counsel)

The banks seek reimbursement in the sum total of $62,862.97 which represents payments by the banks to two law firms. The firms are:

### Sidley & Austin

| | | |
|---|---|---|
| Fees | $ 51,980.00 | |
| Costs | 2,497.97 | |
| Total | | $ 54,477.97 |

### Foster, Pepper & Riviera

| | | | |
|---|---|---|---|
| Fees | $ 8,143.50 | | Costs |
| 242.00 | | Total | $ 8,385.50 |

### The Fees of Davis, Wright, Todd, Riese & Jones

This firm (Davis, Wright) billed Seattle-First National Bank a total of $96,253 for 1239.7 hours. This amounts to an average hourly rate of $77.64. As indicated, this firm was lead counsel. It was primarily involved on behalf of the banks in dealing with the debtor. The computer billings of the firm indicate that the most senior members of the firm who were to any extent involved billed at an hourly rate of between $85–120.

The loan was largely self-liquidating, the trustee and his staff, together with counsel, having engaged in considerable activity by way of sales of property subject to the banks' lien claims. However, at the outset, the banks were owed some $19,000,000, and the debtor's affairs were in a state of disarray. Seattle-First National Bank, as agent for the three banks, was required, under the circumstances, to avail itself of the services of counsel. The records and testimony furnished by Davis, Wright detail the time expended for the banks. The size of the loan and the initial condition of the debtor warranted expenditure of legal effort to review prospects for payment of the loan, the availability of collateral, and some monitoring of the trustee's activities. The trustee does not dispute nor oppose the fees and costs claimed by Seattle-First National Bank.

On the foregoing basis, it is this court's conclusion that the trustee reimburse Seattle-First National Bank in the sum of $101,524.74, of which $96,250.30 represents attorneys' fees and $5,271.74 represents expenses which have been itemized in the billing schedules of counsel.

*Reimbursement of Fees and Expenses to Crocker National Bank and Bank of America*

### Issue Presented

The firm of Shutan & Trost originally represented Crocker and Bank of America. This firm merged with the firm of Sidley & Austin on July 24, 1980. The banks seek reimbursement of legal fees in the sum of $51,980 which is based upon billings by Sidley & Austin for 307.35 hours at an average hourly rate of $169.12. The bulk of the services were furnished by Robert Shutan who billed his time at $175 per hour.

The trustee objects to these charges for two reasons: First, that the hourly rates are excessive and, second, that based on the record, time was unnecessarily incurred and was either redundant or duplicative of the efforts of Davis, Wright. In this connection, the trustee's affidavit, filed on September 10, 1982, states:

(p. 2, 1, 8)

"Seattle-First National Bank had the size, sophistication, and experience to adequately deal with the day-to-day management and protection of the three-bank interests. Its counsel also had the size, professional standing and ability to adequately represent the interests of the banks during the proceedings. As evidenced by the Seattle-First National Bank application for allowance of their counsel's fees as add-ons, it is evident that substantial work was done by Seattle-First National Bank and its counsel in representing and protecting the interests of the three banks.

Based upon the extent of the fees sought to be charged to the estate by Bank of America and Crocker National Bank, Affiant believes that unnecessary duplication of effort was involved and that the banks did not exercise reasonable discretion in seeking more than necessary work by their counsel. In addition to other factors considered by Affiant, the fact that at all times the indebtedness owing to the three banks was secured by collateral having two or three times the value of the indebtedness did not require the California banks to incur the substantial fees over and above those incurred by Seattle-First National Bank on behalf of all three banks.

### Discussion of Legal Principles

Courts, historically, have been charged with allowing and fixing compensation in proceedings of various kinds: probate, domestic relations, anti-trust, Title VII, fees provided for by statute, or as is the case here, fees payable by agreement such as negotiable instruments or security instruments if enforcement of the debt becomes necessary. All the foregoing cases are marked by the fact that attorneys' fees are being assessed against parties who are not the clients of the attorneys. In all cases, where counsel are entitled to fees, the court is called upon to find what is reasonable. A leading case in this area is *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) a Title VII (42 U.S.C. § 2000e *et seq.*) action. Criteria for consideration of fees were as follows:

"(1) *The time and labor required.* Although hours claimed or spent on a case should not be the sole basis for determining a fee ... they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized...

(2) *The novelty and difficulty of the questions.*

(3) *The skill requisite to perform the legal services properly.*

(4) *The preclusion of other employment by the attorney due to acceptance of the case.*

(5) *The customary fee.* The customary fee for similar work in the community should be considered. It is open knowledge that various types of legal work command differing scales of compensation...

(6) *Whether the fee is fixed or contingent.*

(7) *Time limitations imposed by the client or the circumstances.*

(8) *The amount involved and the results obtained.*

(9) *The experience, reputation, and ability of the attorneys.*

(10) *The 'undesirability' of the case.*

(11) *The nature and length of the professional relationship with the client.*

(12) *Awards in similar cases."*

■ See also the ABA Code of Professional Responsibility, Disciplinary Rule 2–106(B) and case law. The basic and underlying standard is one of reasonableness. See *Mike v. Tharp*, 21 Wash.App. 1, 583 P.2d 654 (1978); 11 U.S.C. § 506(b).

A particularly applicable case is *In re Continental Vending Machine Corp.*, 543 F.2d 986, 994 (2nd Cir.1976). This was a bankruptcy case. The court held that secured creditors were entitled to attorneys' fees under security agreements under the ordinary standards and were not to be considered by the more economic standards payable in bankruptcy proceedings under the Bankruptcy Act. The applicable language of the court was:

"We interpret the agreement's broad language as permitting Talcott to recover for such services and expenses as were reasonably necessary to enforce the debtor's obligations and to collect the amount remaining due pursuant to those obligation. In applying this standard, a rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses..." *Id.* at 994.

The court further stated:

"We recognize that to some extent the services rendered to Talcott as a creditor might have duplicated those furnished by other counsel to the trustee in the same matter. However, the fact that the trustee, acting on behalf of the estate, saw fit to provide legal and accounting services in connection with some actions jointly taken by himself and Talcott, did not preclude Talcott from protecting its interest as a secured creditor in obtaining payment, which might differ from that of the estate. However, where the interests of Talcott and the trustee were parallel, the provision of duplicative services by the trustee may be taken into account in appraising the extent and value of the services reasonably necessary to preserve Talcott's interests." *Id.*

### Sidley & Austin—Discussion

The charges of Sidley & Austin, based on the record and testimony, must be considered in the light of the foregoing standards. This should be coupled with the basic contractual conditions for payment per paragraph 9.2 of the loan agreement: "reasonable fees and expenses of each bank's counsel in connection with enforcement of any provisions of this loan agreement and the collection of the note."

The trustee became active at an early stage. His exceptional abilities and initiatives were recognized and accepted, for the most part, by the banks. In any event, they were over-collateralized and subject to the automatic stay of 11 U.S.C. § 362 which they did not contest. Under these circumstances, particularly as matters developed, there was considerable diminution in the need for legal services relating to *enforcement* and *collection* of the loan agreement and note.

The brunt of the burden with respect to dealing with the challenging and complex problems of liquidating the various assets of the estate was borne by the trustee and his counsel. Their efforts resulted in securing funds to liquidate the loans, paying principal and interest at prime rate plus an increment. The efforts of the trustee and counsel have resulted in substantial charges to the estate as to which the banks have not been called upon to make any contribution.

The charges of Sidley & Austin, as shown by the evidence presented to the court, result, for the most part, from services ren-

dered by Mr. Shutan. It is clear that these services primarily involved review of the trustee's management of the estate, conferring with Seattle counsel and reporting to his clients relative to these activities. While this review may have been reassuring to his clients, the issue before us is whether the resulting charges may be termed reasonable in light of the extensive services rendered by competent counsel for the trustee and Davis, Wright. These factors call into question the increment of additional services at a rate more than twice that charged by Davis, Wright. We note the statement by Davis, Wright that there was effort to avoid duplication, but the numerous references in the time records to conferences between co-counsel—some 1500 hours—is difficult to support in light of the general role of monitoring on the part of bank counsel. They were involved to a minimal degree in liquidation of collateral or the conduct of litigation. This is not to say that bank counsel should not have been involved. At the outset, prior to the advent of the trustee and his lawyers, the debtor was disorganized and nominally without counsel. However, as indicated, the trustee expeditiously acted to organize and deal with the debtor's assets.

Assuming that Davis, Wright's charges are fully attributable to enforcement and collection of the note, it is difficult to understand why the efforts of that firm and the charges therefor should not be considered as a measure of reasonableness. These efforts, since the debt will be fully paid, were as effective as those of Sidley & Austin. One can question whether a 25% increment in attorney time at an average hourly rate of more than twice that of Davis, Wright should be charged for the same result. There has been some effort to indicate that the Davis, Wright charges were unusually low. This effort is unconvincing.

■ After reviewing the record in this matter, the court finds and concludes that a not inconsiderable portion of the work done by counsel for Crocker and Bank of America was duplicative, based on the reasonable needs and requirements of the banks and the charges excessive measured by prevailing community standards for legal fees.

The court finds and concludes that Crocker and Bank of America are entitled to reimbursement of attorneys' fees in the amount of $25,000 and costs of $2,497.97, for a total of $27,497.97.

*Fees of Foster, Pepper & Riviera*

■ During the course of the proceedings the two California banks retained the Seattle firm of Foster, Pepper & Riviera to represent them in litigation against Hilton Seafoods. Various parties to the litigation claimed rights to a substantial inventory of warehoused oyster stew and clam chowder.

According to the affidavit of Thomas G. Thorbeck, a partner of Davis, Wright, Todd, Riese & Jones, it was necessary to hire a third firm when "several actual and potential conflicts" arose between Seattle-First National Bank, the agent bank, and the two California banks. The nature of the conflict has not been clearly specified. Mr. Shutan recommended to the banks that they hire another Seattle firm. Mr. Shutan believed it was neither necessary nor appropriate for his law firm to appear in the Hilton Seafoods litigation "in view of there being counsel in Seattle who could handle it."

The California banks have paid Foster, Pepper & Riviera billing of $8,143.50 for fees and costs of $242.00. The only information submitted by the banks to support this claim is a statement from the law firm which itemizes costs and services. The statement, however, does not indicate the amount of time spent nor the hourly rate of the person performing the services. No attorney from this firm appeared to testify as to the nature and extent of the services. It is most difficult to derive an understanding from the bare time sheet itself as to the relationship of the work done by counsel to enforcement and collection of the loan agreement and note.

Because of the lack of definition and specificity with respect to the application of Foster, Pepper & Riviera, together with

lack of testimony with respect thereto, the court is constrained to deny, without prejudice, reimbursement to the banks for fees they paid Foster, Pepper & Riviera. However, costs of $242.00 are allowed.

The foregoing constitutes the Court's findings and conclusions pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. An order may be presented on due notice.