739 F.2d 1233
 Bankr. L. Rep. P 69,943
In the Matter of GLADSTONE GLEN, a Partnership, Debtor,
Appeals of GLADSTONE GLEN, John Hancock Mutual Life
Insurance Company, Michael Sparks.
 Nos. 83-2394, 83-2461 and 83-2485.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1984.
Decided July 19, 1984.
 
 Louis W. Levit, Levit, Miller and Mason, Chicago, Ill., for Gladstone glen.
 John D. Lien, Wilson & McIlvaine, Chicago, Ill., for John Hancock Mut. Life Ins. Co.
 David N. Missner, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for Michael Sparks.
 Russell M. Pelton, Jr., Peterson, Ross, Schloerb and Seidel, Chicago, Ill., for Union Dime Sav.
 Before BAUER, WOOD and ESCHBACH, Circuit Judges.
 ESCHBACH, Circuit Judge.
 
 
 1
 This appeal, involving Chapter XII of the Bankruptcy Act of 1898 ("Act"), 11 U.S.C. Secs. 801-926 (1976) (repealed), raises questions of first, and probably last, impression in this circuit. More common challenges to factual findings are also presented. With one exception, we agree with the Bankruptcy Court's resolution of the case. Our single disagreement is significant, however, and requires us to remand the case for further proceedings.
 
 I.
 
 2
 The subject of this Chapter XII proceeding is a heavily encumbered apartment complex in Prospect Heights, Illinois. By 1975, this property was subject to three mortgages securing non-recourse notes: John Hancock Mutual Life Insurance Company ("Hancock") and Union Dime Savings Bank ("Union Dime") held first mortgages on different parts of the real estate, and State Mutual Investors ("SMI") held a second mortgage on the entire property.
 
 
 3
 In January of 1975, John Markay and Vincent Bolger formed a partnership, Gladstone Glen, to acquire and operate this apartment complex. Gladstone Glen purchased the property from Michael Sparks and, as part of the transaction, executed and delivered to Sparks two non-recourse notes evidencing a principal debt of $630,000; these notes are secured by a third mortgage on the real estate. To make the purchase sufficiently attractive, Hancock agreed to an 18-month moratorium on principal payments. This assistance proved inadequate, however, and in 1977 Gladstone Glen failed to make payments owing to the second mortgagee--SMI. Thus SMI commenced a foreclosure action, which prompted Gladstone Glen to file its Chapter XII petition on September 23, 1977.
 
 
 4
 When the Chapter XII proceedings became protracted, SMI pressed for a prompt cash settlement. SMI negotiated with Markay and Bolger, Gladstone Glen's partners, and reached an agreement in December of 1978. Markay and Bolger, together with Frank Muriello, formed a partnership known as MBM Associates ("MBM"), which purchased the SMI mortgage and related papers for a price of $250,000. Muriello's capital contribution was minimal and, in fact, he was included in the deal only to ensure that the SMI mortgage did not merge into the fee held by Gladstone Glen.
 
 
 5
 Union Dime also sought relief from Chapter XII's strictures, but unlike SMI, turned to the statute's provisions. Citing Sec. 517 of the Act, 11 U.S.C. Sec. 917, Union Dime contended that as a Federal Home Loan Bank it was exempt from Chapter XII. The Bankruptcy Court disagreed, and, consequently, proceeded to consider the merits of the debtor's Second Amended Arrangement ("Plan").
 
 
 6
 On May 4, 1982, the Bankruptcy Court entered an order confirming the Plan over the objections of Hancock, Union Dime, and Michael Sparks. The Plan, which purports to cure all arrearages owed to Hancock and Union Dime, provides no distribution to Sparks. The Bankruptcy Court also awarded Hancock $174,302 and Union Dime $1,000 in attorneys' fees.
 
 
 7
 The Bankruptcy Court's orders did not survive long on appeal. The District Court held, contrary to the Bankruptcy Court's decisions, that (1) Sec. 517 of the Act exempts Union Dime from Chapter XII, (2) the second mortgagee, MBM, is not entitled to assert fully its claim, and (3) Union Dime is entitled to attorney's fees greater than $1,000. In all other respects, the District Court affirmed the Bankruptcy Court's orders. Gladstone Glen, Hancock, and Sparks appeal from the District Court's judgment.
 
 II.
 
 8
 Before filing its Chapter XII petition, Gladstone Glen made all payments owing to Union Dime; once this case commenced, however, no payments were made for a year. In October of 1978, Gladstone Glen resumed making full payments as required by the Union Dime note. Moreover, the Plan provides that, upon confirmation, all arrearages will be paid to Union Dime in cash, and thereafter Gladstone Glen will make payments according to the note. Nevertheless, Union Dime maintains that the Chapter XII proceedings and Plan run afoul of Sec. 517 of the Act, which states that Chapter XII's provisions shall not "be deemed to allow extension or impairment of any secured obligation held by ... any Federal Home Loan Bank."
 
 
 9
 An "extension" within the meaning of this section occurs when a debt is "paid in full but over a longer period of time than would otherwise be required." In re Consolidated Motor Inns, 5 Collier Bankr.Cas. 301, 307 (W.D.Ga.1975). In other words, if an obligation evidenced by a 20-year note is modified to allow payments over 30 years, the debt is extended. See In re Smith, 20 Collier Bankr.Cas. 368, 370 (E.D.Pa.1979); R. Cowans, Bankruptcy Law & Practice 355 (1978). The meaning of "impairment" is less clear, but we agree with the judicial decisions holding that a secured obligation is not impaired if the value of the creditor's security is not diminished during the Chapter XII proceeding or by operation of the confirmed plan. See In re Smith, supra, at 371; In re Hall Associates, 8 Collier Bankr.Cas. 290, 293 (E.D.Pa.1976); In re Consolidated Motor Inns, supra, at 308. Viewed in this light, plainly there has been no "extension" or "impairment" of the debt owed Union Dime, nor will there be pursuant to the provisions of the debtor's Plan; all arrearages will be cured on confirmation, payments will be made according to the terms of the note, and the obligation will remain fully secured.
 
 
 10
 We acknowledge that Union Dime has been affected by the Chapter XII proceedings. Absent the Act's automatic stay provision, Union Dime could have foreclosed on the mortgage, an option lost when the arrearages are cured upon confirmation of the Plan, see Ill.Rev.Stat. ch. 95, p 57 (1983). We do not view the impact of the stay, however, as an "extension" or "impairment" within the meaning of Sec. 517. To hold otherwise would, in essence, render Federal Home Loan Banks exempt from Chapter XII's provisions--a clearly unintended result. Congress knew how to exempt obligations from Chapter XII and, indeed, did provide in Sec. 517 that nothing in the "chapter shall be deemed to affect or apply to the creditors of any debtor under a mortgage insured pursuant to the National Housing Act." (Emphasis added.) See Matter of Thornhill Way I, 636 F.2d 1151 (7th Cir.1980). The deference accorded Federal Home Loan Banks is much less, and we will not, by focusing on the stay, interpret "extension" or "impairment" to mean "affect" or "apply to." See In re Hall Associates, supra, at 292; see generally Continental Illinois National Bank & Trust Co. v. Chicago, R.I. & Pac. Ry., 294 U.S. 648, 676-77, 55 S.Ct. 595, 606-07, 79 L.Ed. 1110 (1935). We therefore reverse the District Court's judgment directing the dismissal of Union Dime from this case.
 
 III.
 
 11
 As noted above, in December of 1978 Gladstone Glen's partners formed a new partnership--MBM--to purchase the notes, mortgage, and related papers held by SMI (collectively known as the "SMI mortgage"). At the time of the transaction, $640,000 of principal and $170,333 of interest were owing on the mortgage. Because SMI naturally viewed the loan as distressed, however, MBM purchased the SMI mortgage for only $250,000. The instant dispute arose when MBM subsequently intervened in this case and sought to enforce the SMI mortgage in full. The third mortgagee, Michael Sparks, argued to the Bankruptcy Court that MBM's claim should be subordinated or, at least, significantly reduced. The Bankruptcy Court disagreed and, after considering the value of the real estate and the amount of outstanding debt, concluded that Sparks' mortgage had no value. Accordingly, the debtor's Plan, which provides no distribution to the objecting creditor Sparks, was approved pursuant to the "cram down" provision of Sec. 461(11) of the Act, 11 U.S.C. Sec. 861(11) (1976).
 
 
 12
 On appeal to this court, the debtor and Sparks cite well-known, but inapposite, rules of law. Sparks notes that MBM is, in essence, Markay and Bolger, and "the claims of individual partners may not be satisfied prior to those of firm creditors of a bankrupt partnership." 1A J. Moore & L. King, Collier on Bankruptcy 731 (14th ed. 1978). The rationale supporting this rule, however, is missing in this case; the debts are non-recourse and the partners did not use estate property to purchase the SMI mortgage. The debtor, on the other hand, quotes the rule that a "purchase of creditors' claims during reorganization is not prohibited and will be given effect." 14A J. Moore & L. King, Collier on Bankruptcy 12-30-10 (14th ed. 1978). But this rule is conditional and subject to modification when the purchaser is also the debtor. In fact, we are unaware of any statutory or common law on point. Our disposition of this issue will thus be guided by the principle that the power of a "bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete." Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941).
 
 
 13
 There are reasons to permit MBM to assert the rights and position held previously by SMI. When Sparks took a third mortgage on the property, he knew that his position was inferior to the SMI mortgage. He also knew that he had no recourse against Gladstone Glen's partners. To subordinate the mortgage now held by MBM, therefore, would provide Sparks with an unwarranted windfall. See Mintz v. Kupferstein, 14 Misc.2d 1034, 177 N.Y.S.2d 652, 654 (N.Y.Sup.Ct.1958). Moreover, if those associated with a debtor are unduly penalized for purchasing a claim, creditors who want to liquidate positions may be unable to find any purchaser.
 
 
 14
 Yet there are very good reasons to prevent MBM (Markay and Bolger) from completely stepping into SMI's shoes. Sparks may have no legal right to expect priority over SMI, but he has the equitable right to know that those who would "cram down" a plan extinguishing his claim do not unduly profit from the venture. If the Bankruptcy Court's ruling is upheld, not only will Markay and Bolger eliminate Sparks' mortgage, they will stand to make a significant profit on the SMI-mortgage purchase. Sparks, in fact, would gain more were the estate liquidated and the proceeds distributed only to the first and second mortgagees; he would at least be confident that his mortgage was truly worthless and that Markay and Bolger did not profit from his misfortune.
 
 
 15
 We are not much impressed by the debtor's argument that
 
 
 16
 Markay and Bolger knowingly and voluntarily took the risk, (which Sparks was unwilling to take), that the SMI mortgage would deteriorate in value. Having taken that risk, they, not Sparks, should be the ones to benefit if the value of the mortgage they acquired has actually increased.
 
 
 17
 The debtor (Markay and Bolger) largely controls the factors affecting the mortgage's value--i.e., the fair market value of the property and the debt owed to first mortgagees. Thus the risk that Markay and Bolger took was far less than had Sparks purchased the SMI mortgage. And by the purchase, Markay and Bolger also secured one creditor's (MBM's) consent to the Plan, something of no value to Sparks. Indeed, few prudent investors, who already face losing a junior mortgage, would be willing to pay $250,000 for another distressed claim.
 
 
 18
 In light of the countervailing equities, therefore, we hold that for purposes of the Act's "cram down" provision, Sec. 461(11), MBM may assert a claim of $250,000, the consideration paid for the SMI mortgage, plus interest that has accrued on the $250,000 since the purchase. See Matter of The Bridgeford Company, 237 F.2d 182, 186 (9th Cir.1956); In re V-I-D, Inc., 101 F.Supp. 71, 75 (N.D.Ind.1951); 6 Part 2 J. Moore & L. King, Collier on Bankruptcy 1536 (14th ed. 1978). MBM's claim will not be subordinated and thus Markay and Bolger will not be unduly punished for the transaction. Concomitantly, Sparks will not receive a windfall, but will share the benefits resulting from SMI's willingness to liquidate its position at a discount. See American United Mutual Life Insurance Co. v. Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 162, 85 L.Ed. 91 (1940) (If an "investigation discloses the existence of ... special benefits for the reorganizers, ... the court has ample power to adjust the remedy."). Accordingly, as modified by this opinion, we affirm the District Court's judgment reversing the Bankruptcy Court's treatment of MBM's claim.
 
 IV.
 
 19
 The Bankruptcy Court awarded Hancock attorneys' fees in the amount of $174,302. Gladstone Glen acknowledges that fees may be awarded in this case, see In re Continental Vending Machine Corp., 543 F.2d 986, 993 (2d Cir.1976); Huber v. Brown, 243 Ill. 274, 278, 90 N.E. 748, 749 (1909), but contends that Hancock is entitled to fees only for time spent negotiating a plan, not trying to dismiss the case and accelerate the loan.
 
 
 20
 We believe that the distinction Gladstone Glen makes is not found in the Hancock mortgage. The mortgage states:
 
 
 21
 [I]f any action or proceeding is commenced ... in which the mortgagee deems it necessary to defend in order to uphold the lien of this mortgage ... or otherwise to protect its security hereunder, all sums paid or incurred by the mortgagee for counsel fees and other expenses ... shall be repaid by the mortgagor.
 
 
 22
 This language is very broad and encompasses an effort to have this Chapter XII case dismissed. But for the automatic stay provision of the Act, Hancock would have been free to accelerate the loan once Gladstone Glen ceased all payments in 1977. Subsequent attempts to accelerate the loan, therefore, were consistent with Hancock's contractual rights and constituted efforts "to protect its security" or "to uphold the lien of th[e] mortgage." Given no challenge to the reasonableness of the fees, see In re Schumaker Construction, Inc., 346 F.2d 353, 355 (7th Cir.1965), the award will be affirmed.
 
 
 23
 The Union Dime mortgage, like Hancock's, initially contained a virtually unlimited provision for attorneys' fees. In July of 1977, however, the parties executed a modification agreement that states, "Union Dime legal fees not to exceed $1,000." Giving effect to this language, the Bankruptcy Court awarded Union Dime fees in the amount of $1,000.
 
 
 24
 We disagree with Union Dime's assertion that the $1,000 limit clearly refers only to fees relating to the modification agreement. The fee-limitation provision is sandwiched between the statements "The Bank approves a modification of the mortgage" and "All other terms of the existing mortgage shall apply." Consequently, the fee limitation (as well as other terms in the modification agreement) appears to relate back to modify the mortgage itself. In any event, such an interpretation is reasonable, and because "any ambiguity must be strictly construed against" the bank, Zimmerman v. First Production Credit Ass'n, 89 Ill.App.3d 1074, 1076, 45 Ill.Dec. 83, 84, 412 N.E.2d 216, 217 (1980), we hold that Union Dime's fees may not exceed $1,000. The District Court's judgment to the contrary is therefore reversed.
 
 V.
 
 25
 The final two issues presented are challenges to findings of fact. Hancock attacks the Bankruptcy Court's finding that "Hancock by its conduct and statements agreed to a balloon payment of the deferred principal at maturity." Sparks and Gladstone Glen disagree with the Bankruptcy Court's finding that the fair market value of the apartment complex is $5,900,000. Guided by the clearly-erroneous standard of review, see Highland Village Bank v. Bardwell, 610 F.2d 228, 230 (5th Cir.1980), we will disturb neither finding.
 
 
 26
 In connection with the purchase and renovation of the apartment complex, Gladstone Glen received permission from Hancock to make interest-only payments for 36 months. Hancock contends that the deferred principal is now owing; thus the total arrearages are in excess of $800,000. The Bankruptcy Court, however, found that Hancock agreed to accept repayment of the principal in a lump sum at maturity--i.e., a 'balloon payment'--and, consequently, the total in arrears is approximately $300,000. This factual dispute is legally significant because if Hancock is correct, then the Plan does not provide adequate protection, Sec. 461(11), and may not be confirmed over Hancock's objection, see Matter of Cartwright Land Associates, 3 B.R. 277, 279 (Bankr.S.D.N.Y.1980).
 
 
 27
 Our review of the record, however, discloses that the Bankruptcy Court did not clearly err. The possibility of a balloon payment at maturity was discussed when Hancock initially agreed to interest-only payments. Although Hancock, at that time, did not formally agree to a balloon payment, its subsequent acts evidence such assent. John Markay, a Gladstone Glen partner, testified that he believed the total arrearages were approximately $300,000, and that in all discussion with Hancock prior to April 1980, Hancock never indicated that the arrearages were greater. Indeed, in motions filed in 1978 and 1979, and in open court on April 9, 1979, Hancock referred to the arrearages as approximately $300,000. Furthermore, when Gladstone Glen resumed payments in October 1978, it tendered to Hancock installments based on the original schedule set forth in the notes. Hancock accepted the payments without suggesting or demanding that the payments be increased to recapture the deferred principal. Hancock did file a motion regarding the resumed payments, but only to ensure that the negotiation of the debtor's checks would not constitute acceptance of the Plan.
 
 
 28
 Similarly, we cannot term clearly erroneous the finding that the fair market value of the real estate is $5,900,000. The Bankruptcy Court based this finding on a detailed and comprehensive study performed by William McCann, an expert appraiser. Employing cost, market-data, and income approaches, and correlating the results, McCann determined that the value of the apartment complex, as of April 7, 1980, was $5,900,000. Sparks takes issue with some figures employed in the income approach; however, because the ultimate value found is $500,000 greater than the income-approach result ($5,400,000), Sparks has not convinced us that the Bankruptcy Court's finding of value is clearly too low.
 
 
 29
 Moreover, we readily reject Gladstone Glen's assertion that the income approach (i.e., the amount a person would be willing to invest to receive the income that the property produces) is the only acceptable way to measure value. An actual purchase, of course, is "the truest indicator of value," In re Spicewood Associates, 445 F.Supp. 564, 569 (N.D.Ill.1977), and an offer may, on occasion, serve as a surrogate for a purchase, see Matter of Hartsdale Associates, III Bankr.Ct.Dec. 1137, 1138 (Bankr.S.D.N.Y.1977). We disagree with Sparks' contention, however, that this is such an occasion and that the Bankruptcy Court was required to give substantial weight to a $7,000,000 offer made by John Vigilante. The record shows that Vigilante, a friend of Sparks, left his offer open only for one day. Furthermore, Sparks' attorneys prepared the offer, Sparks suggested the $7,000,000 price, and Vigilante never examined the relevant mortgages or financial statements, nor consulted an attorney or accountant. In short, there were sufficient grounds for the Bankruptcy Court to disregard the Vigilante offer in favor of the McCann appraisal.[1]
 
 VI.
 
 30
 Because we disagree with the Bankruptcy Court's treatment of MBM's purchase of the SMI mortgage, further proceedings are required to determine whether Sparks' mortgage has value. It is thus premature for us to decide whether the Plan, in general, satisfies the requisites for confirmation, Sec. 472, 11 U.S.C. Sec. 872 (1976). See generally Matter of Burgess Wholesale Manufacturing Opticians, Inc., 721 F.2d 1146, 1147-48 (7th Cir.1983). Accordingly, we affirm in part, reverse in part, and remand the case for proceedings consistent with this opinion. Costs are awarded to Gladstone Glen.
 
 
 
 [1]
 We note that the McCann report is now over four-years old and may be out-of-date. Thus, if the precise value of the property remains critical on remand, and a sufficient offer of proof is made, further valuation proceedings will be in order